******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PRESIDENTIAL VILLAGE, LLC *v.*
MELISSA PHILLIPS ET AL.
(SC 19762)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued December 7, 2016—officially released May 9, 2017*

*Hugh D. Hughes*, with whom, on the brief, was *David
E. Schancupp*, for the appellant (plaintiff).

*Shelley A. White*, for the appellee (named defendant).

*Opinion*

ROBINSON, J. The principal issue in this appeal is whether the trial court abused its discretion by relying on the "spirit" of certain regulations issued by the United States Department of Housing and Urban Development (department), which generally concern accommodations for handicapped persons, in support of an equitable defense to the eviction of a tenant who kept an "emotional support dog" in her federally subsidized rental apartment in violation of a pet restriction clause contained within her lease. The plaintiff, Presidential Village, LLC, appeals[1] from the judgment of the trial court in favor of the named defendant, Melissa Phillips,[2] in this summary process action. On appeal, the plaintiff contends that the trial court improperly: (1) relied on the "spirit" of the department's regulations because the defendant's niece, M,[3] who lived in the defendant's apartment, was not disabled within the meaning of those regulations and, as such, federal disability law did not require the plaintiff to allow M to keep a dog in the apartment as a reasonable accommodation; (2) weighed the equities as a defense to eviction when the plaintiff lacked notice of the defense of equitable nonforfeiture and, thus, could not offer evidence about the purpose of the pet restriction; and (3) admitted into evidence, over the plaintiff's hearsay objection, a letter signed by a physician and social worker who had provided services to M. In response, the defendant contends to the contrary, and also argues that this court lacks subject matter jurisdiction because this appeal was rendered moot when the plaintiff commenced an ancillary summary process action against the defendant. We conclude that the plaintiff's appeal is not moot, and further conclude that the trial court abused its discretion by relying upon an improper ground in determining that the defendant was entitled to equitable relief from the forfeiture of her tenancy in accordance with *Fellows* v. *Martin*, 217 Conn. 57, 66–67, 584 A.2d 458 (1991). Accordingly, we reverse the judgment of the trial court and remand the case for a new hearing with regard to the defendant's equitable defense.

The record reveals the following relevant facts and procedural history. For her entire life, the defendant has lived in an apartment in New Haven in a complex owned by the plaintiff. Her mother, the previous leaseholder, kept a dog named Mellow[4] in the apartment prior to her death in August, 2013. After her mother's passing, the defendant obtained legal guardianship over four of her nieces and nephews, who also were living in the apartment. Mellow provides comfort in particular to M, who is the defendant's oldest niece.

The defendant subsequently signed a new department model lease with the plaintiff. This lease included a clause prohibiting the defendant from keeping dogs on the property.[5] The defendant was aware that the lease

did not permit her to keep a dog in the apartment when she signed it, but nevertheless thought it was acceptable to keep Mellow because her mother had done so. On the basis of this fact, the defendant believed that the plaintiff would not enforce the pet restriction and, accordingly, continued to keep Mellow in her apartment in violation of her lease.

In May, 2015, the plaintiff sent a pretermination notice in accordance with General Statutes § 47a-15[6] to the defendant, advising her that she had violated her lease by keeping a dog in her apartment. On June 23, 2015, the plaintiff served a notice to quit on the defendant and subsequently filed the present summary process action. The defendant, appearing as a self-represented party, responded by filing an answer to the complaint and the following special defense: "[T]he dog was originally mom's dog that occupied the apartment for [six] years prior to my leasing the place. Mom passed away in 2013 when I then took over residence. I have been able to keep the dog that the four children I am raising and myself have become attached to. Once I begin complaining again about the condition of the apartment I was given [fifteen] days to get rid of dog which was unreasonable. The dog has been given to brother on July 2, 2015. I tried to contact landlord but hasn't replied." The plaintiff subsequently denied the allegations in the special defense.

During the first hearing before the trial court, Michelle Scott, the plaintiff's property manager, testified about the lease and confirmed that it included a clause restricting pets.[7] Scott stated that she personally had no knowledge that a dog was living in the apartment prior to the defendant signing the lease with the plaintiff. The defendant then testified that the children and Mellow resided in her apartment. Specifically, the defendant stated that Mellow had resided in the apartment before she signed the lease, which is why she did not think that the plaintiff would enforce the pet restriction. The defendant then testified that she had tried to find a new home for Mellow with someone who could provide continuing access for the children in light of their emotional issues and their attachment to Mellow. The defendant stated that she had learned recently that she could get Mellow certified as a service animal and that she would like to obtain such a certification in order for Mellow to remain in the apartment. The defendant also stated that she did not know whether her mother had received notification from the plaintiff, prior to her death, about having to remove Mellow from the apartment. The trial court then continued the case in order to give the defendant additional time to find a new home for Mellow or to certify her as a service animal.

At the second hearing date, the defendant still had not found a new home for Mellow. Rather, the defendant

obtained a letter from M's physician and social worker indicating that Mellow provided comfort to M, who was dealing with a personal loss.[8] In addition, the defendant obtained an Internet certificate declaring Mellow to be an "Emotional Support Dog." The trial court admitted both documents into evidence over the defendant's hearsay objections. The trial court then continued the hearing to permit additional evidence and arguments with respect to federal disability law and its application to the present case. Subsequently, on October 8, 2015, the defendant indicated to the court that Mellow does not accompany the children to school, that none of the children are physically disabled, and that Mellow was providing comfort to the children and, in particular, M.

After the hearings, the trial court credited the defendant's testimony and found that Mellow had lived in the house for years prior to her mother's death, and that the plaintiff was aware of Mellow's presence in the apartment. The trial court also credited the defendant's testimony that M takes great comfort from Mellow and has started to " 'act out' " because of the emotional circumstances in her life. The trial court further noted that the letter from M's physician and social worker supported the defendant's testimony. Ultimately, the trial court determined that "the spirit of the [department's] regulations has been followed by the defendant in this case. She has established that [Mellow] acts as a therapy dog for [M]. Furthermore, the court has weighed the harm to the plaintiff that would come from [Mellow's] continued presence . . . and the harm that would come to [M] from having [Mellow] removed from the household and finds that the equities favor the defendant. Therefore, the court invokes its equitable powers to rule in favor of the defendant."[9] This appeal followed. Additional facts will be set forth as necessary.

I

Because it implicates our subject matter jurisdiction; *Housing Authority* v. *Lamothe*, 225 Conn. 757, 762–64, 627 A.2d 367 (1993); we begin with the defendant's claim that this appeal is moot. Specifically, the defendant argues that this appeal cannot afford the plaintiff meaningful relief because, while this appeal was pending, the plaintiff commenced a second summary process action against her in March, 2016, the filing of which had the effect of affirmatively reinstating her tenancy. In supplemental briefing, the defendant contends, in the alternative, that the trial court's subsequent dismissal of the plaintiff's second action reinstated her lease, meaning that reversal of the judgment in this appeal will not result in an order granting possession to the plaintiff.[10] In response, the plaintiff claims that the final judgment in favor of the defendant in the first action, which the plaintiff is challenging in this appeal, reinstated the defendant's lease. The plaintiff then argues that the second action does not affect this court's sub-

ject matter jurisdiction because the trial court dismissed the second action on the ground that the underlying notice to quit, which is a prerequisite to a summary process action, was invalid because it was served in the wrong month. The plaintiff contends that an invalid notice to quit is void and, as such, the status of the case before this court is as if the second action never occurred. We agree with the plaintiff that the second notice to quit, which was invalid and therefore void, did not operate to terminate the defendant's lease. Accordingly, we conclude that the present appeal is not moot.

The defendant's mootness claim requires us to determine the effect of the service of an invalid notice to quit during the pendency of a landlord's appeal from a judgment in favor of the tenant in a prior summary judgment action. "Summary process is a statutory remedy which enables a landlord to recover possession of rental premises from the tenant upon termination of a lease. . . . It is preceded by giving the statutorily required notice to quit possession to the tenant. . . . Service of a notice to quit possession is typically a landlord's unequivocal act notifying the tenant of the termination of the lease. The lease is neither voided nor rescinded until the landlord performs this act and, upon service of a notice to quit possession, a tenancy at will is converted to a tenancy at sufferance." (Citations omitted.) *Housing Authority* v. *Hird*, 13 Conn. App. 150, 155, 535 A.2d 377, cert. denied, 209 Conn. 825, 552 A.2d 433 (1988). "A legally invalid notice to quit is, however, considered 'equivocal' because of that legal defect and, therefore, does not operate to terminate a lease." *Waterbury Twin, LLC* v. *Renal Treatment Centers–Northeast, Inc.*, 292 Conn. 459, 473 n.18, 974 A.2d 626 (2009); see also *Bargain Mart, Inc.* v. *Lipkis*, 212 Conn. 120, 134, 561 A.2d 1365 (1989) ("it is self-evident that if the notice [to quit] is invalid, then the legal consequence of 'termination' arising from the service of a valid notice [to quit] does not result"); id., 135 ("[b]ecause the trial court in the summary process action did not determine whether the notices to quit were valid, we have no basis for concluding that those notices terminated the . . . lease"); *Bridgeport* v. *Barbour-Daniel Electronics, Inc.*, 16 Conn. App. 574, 582–83, 548 A.2d 744 (notice to quit invalid because of untimely service did not terminate month-to-month tenancy and cannot serve as basis for summary process action, thus requiring service of second notice to quit), cert. denied, 209 Conn. 826, 552 A.2d 432 (1988).

We find instructive the Appellate Court's decision in *Housing Authority* v. *Hird*, supra, 13 Conn. App. 150. In *Hird*, the tenant entered into a written lease with the landlord on January 9, 1981. Id., 152. In June, 1985, the landlord sent the tenant a written notice of proposed eviction because the tenant had violated the lease by maintaining the property in an unsanitary condition and

keeping pets on the property. Id., 152–53. In July, 1985, the landlord served the tenant with a notice to quit. Id., 153. A summary process action resulted in a judgment for the tenant on November 6, 1985. Id. The landlord then served the tenant with a second notice to quit on November 15, 1985, alleging nonpayment of rent for that month as the reason for eviction. Id. The tenant moved to dismiss the second summary process action for failure to comply with federal regulations, and the landlord withdrew the second notice to quit in January, 1986. Id. While the second summary process action was pending, the tenant sought to reinstate the lease, which the landlord refused because of nonpayment of rent. Id., 154. In January, 1986, the landlord served the tenant with a third notice to quit for nonpayment of rent for that month. Id. In the third summary process action, "[t]he trial court rendered judgment of possession for the [landlord], ruling that the [tenant] was then occupying her apartment under her lease as a tenant at will in January, 1986. Consequently, she had a duty to tender rent for that month's tenancy, which she breached." (Internal quotation marks omitted.) Id. The trial court determined that "the [tenant] was occupying her apartment under her lease as a tenant at will on January 1, 1986, because the judgment rendered on November 6, 1985, in [the tenant's] favor did not terminate the lease, and, therefore, had 'revived' the original lease arrangement, and because the eviction action following the November 15, 1985 notice to quit possession having been withdrawn, had no legal effect or consequence on the preexisting lease between the parties." Id., 155. On appeal, the Appellate Court agreed. It held that "[t]he withdrawal of the [second] summary process action on January 29, 1986, effectively erased the court slate clean as though the eviction predicated on the November 15, 1985 notice to quit possession had never been commenced. The plaintiff and the defendant were 'back to square one,' and the continuation of their lease of January 9, 1981, was restored." Id., 157.

In the present appeal, the trial court's judgment in favor of the defendant in the first summary process action, which is the subject of this appeal, reinstated the lease between the two parties. The filing of this appeal from the trial court's decision in the first summary process action did not affect the reinstatement of the lease. The second notice to quit, which was deemed invalid, did not operate to terminate that lease, which continues in effect. See *Waterbury Twin, LLC* v. *Renal Treatment Centers–Northeast, Inc.*, supra, 292 Conn. 473 n.18. Put differently, the status quo between the parties was restored when the second notice to quit was held invalid in the second summary process action; it became as if the plaintiff never filed a second notice to quit and the lease remained reinstated. Accordingly, we conclude that meaningful relief may be granted and that, therefore, this appeal is not moot.[11]

## II

We turn now to the plaintiff's claim that the trial court improperly determined that the equities in this case favored the defendant, particularly given that she followed "the spirit of the [department's] regulations" in establishing that allowing Mellow to remain in the apartment was a reasonable accommodation for M's disabilities. The plaintiff contends that the department's regulations are inapplicable because the defendant has not demonstrated that M has a handicap as defined by the relevant federal laws, namely, a disease or illness indicating the substantial alteration of a major life activity. See, e.g., 42 U.S.C. § 3602 (h) (2016). Additionally, the plaintiff contends that the trial court abused its discretion by using the spirit of the law to, in effect, rewrite federal law in order to allow such an accommodation, when those laws clearly do not extend to this case. Finally, the plaintiff claims that the trial court never adequately weighed the equities in this case because the plaintiff lacked notice to offer evidence about the purpose of its pet restriction.

In response, the defendant claims that the trial court did not abuse its discretion in rendering a judgment in this summary process case based on equity. Specifically, the defendant contends that she proved her entitlement to equitable relief under *Fellows* v. *Martin*, supra, 217 Conn. 66–67, by demonstrating: (1) that her breach was not wilful or grossly negligent; (2) that upon eviction, she will suffer a loss wholly disproportionate to the injury to the plaintiff; and (3) that the plaintiff's injury is reparable. Further, the defendant claims that she adequately pleaded equity as a special defense, which provided the plaintiff with notice of that issue. For the reasons which follow, we agree with the plaintiff that the trial court abused its discretion by relying on the spirit of the department's regulations to rule, in equity, for the defendant.

"[E]quitable defenses and counterclaims implicating the right to possession are available in a summary process proceeding. If, then, the tenant's equitable claim was properly raised, it was properly before the trial court. . . .

"Equitable principles barring forfeitures may apply to summary process actions . . . if: (1) the tenant's breach was not [wilful] or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury to the landlord; and (3) the landlord's injury is reparable." (Citations omitted; internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, 225 Conn. 771, 777–78, 627 A.2d 386 (1993). "A landlord's injury is reparable if it can be remedied by money instead of forfeiture of the tenancy." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279

Conn. 90, 97 n.8, 900 A.2d 1242 (2006). Although originally articulated in the context of the nonpayment of rent, the doctrine of equitable nonforfeiture may be applicable in evictions arising from violations of other lease terms. See *PIC Associates, LLC* v. *Greenwich Place GL Acquisition, LLC*, 128 Conn. App. 151, 173–74, 17 A.3d 93 (2011); *Fairchild Heights, Inc.* v. *Dickal*, 118 Conn. App. 163, 178–79, 983 A.2d 35 (2009), aff'd, 305 Conn. 488, 45 A.3d 627 (2012).

We employ the abuse of discretion standard when reviewing a trial court's decision to exercise its equitable powers. See *Fellows* v. *Martin*, supra, 217 Conn. 67–68. "Although we ordinarily are reluctant to interfere with a trial court's equitable discretion . . . we will reverse where we find that a trial court acting as a court of equity could not reasonably have concluded as it did . . . or to prevent abuse or injustice." (Citations omitted.) Id. "In reviewing claims of error in the trial court's exercise of discretion in matters of equity, we give great weight to the trial court's decision. . . . [E]very reasonable presumption should be given in favor of its correctness. . . . The ultimate issue is whether the court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *Elliott* v. *South Isle Food Corp.*, 6 Conn. App. 373, 377, 506 A.2d 147 (1986).

A

We begin with the question of whether the trial court properly relied on the "spirit" of the department's regulations in exercising its equitable discretion. Because the apartment is federally subsidized by the department, the plaintiff is required to comply with the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. (2016), the department's regulations concerning accommodations for handicapped persons; see 24 C.F.R. § 100.200 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2016),[12] and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (2016).[13] Each of these requires that a reasonable housing accommodation be given to a person with "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment . . . ." 42 U.S.C. § 3602 (h) (2016); see also 24 C.F.R. §§ 8.3 and 100.201. These laws further define "[p]hysical or mental impairment" to include the following: "(1) Any physiological disorder or condition . . . or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. . . ." 24 C.F.R. § 100.201 (a); see also 24 C.F.R. § 8.3 (a). Additionally, the term "[m]ajor life activities" is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R.

§ 100.201 (b); see also 24 C.F.R. § 8.3 (b). Thus, to qualify for a reasonable housing accommodation, one must demonstrate a physical or mental impairment that substantially limits one or more of such person's major life activities.

We begin with a review of the record to determine whether it supported the trial court's decision to grant relief under the "spirit" of the federal regulations. At trial, the defendant did not claim that she, her nieces, or nephews have a qualifying disability, either physical or mental, that would necessitate a reasonable housing accommodation. Indeed, she testified that none of the occupants of the home have major life activities that are impacted by a qualifying disability, stating specifically that none of the four children have difficulty with daily activities such as brushing their teeth and getting dressed. Rather, the defendant testified that Mellow is an "emotional support dog" that she keeps for the "emotional comfort and the mental state" of M. The defendant explained that all of the children have emotional difficulties because their mother, the defendant's sister, essentially abandoned them, despite living across the street. Further, the children watched the defendant's mother, their grandmother, die while in hospice care in their home. Moreover, M herself had lost a child around the time the plaintiff brought the summary process action. Ultimately, the defendant described Mellow as being a source of comfort to the children in the home. Indeed, she testified that Mellow does not attend school in a therapeutic capacity for the children.

A letter jointly authored by M's social worker, Lucia Venditti, and physician, Linda Fan, supports the defendant's testimony about M's emotional difficulties. Venditti and Fan state in the letter that M is a patient in their clinic, "has been dealing with a personal loss," and has found comfort in Mellow. The letter then describes, in a bullet point list, the health benefits associated with interacting with a pet. The letter does not, however, opine that M has a mental or physical disability as contemplated by federal law. The letter also does not describe with any level of specificity the health benefits that M receives from interacting with Mellow. Lastly, it is of note that at no time did M testify as to any mental or physical disability she suffers.

Although one may be sympathetic to the emotional benefits that Mellow provides to the defendant and her family given their traumatic family history, we nevertheless disagree with the trial court's conclusion that allowing them to keep Mellow in the apartment is consistent with "the spirit of the [department's] regulations . . . ." On the basis of the record, with no evidence demonstrating that any one of the residents of the apartment has a physical or mental disability affecting a major life activity, the trial court could not have reasonably concluded that the defendant satisfied the "spirit"

of the relevant federal regulations, which provide relief only for specifically defined physical or mental disabilities. See, e.g., *Mazzocchi* v. *Windsor Owners Corp.*, 204 F. Supp. 3d 583, 610–11 (S.D.N.Y. 2016) (assuming woman suffers from bipolar disorder, vague description of such disorder impacting various life activities not enough to fall within meaning of Fair Housing Act); cf. *Chapman* v. *Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) ("obedience to the spirit of the [Americans with Disabilities Act] does not excuse non-compliance with" governing federal regulations [internal quotation marks omitted]). Put differently, the doctrine of equitable nonforfeiture does not provide a bypass of the proof necessary to establish qualification for a reasonable housing accommodation under federal disability laws. Accordingly, the trial court improperly relied on the spirit of the federal regulations to support its equitable decision in favor of the defendant.

B

We further conclude that the trial court abused its discretion in applying the doctrine of equitable nonforfeiture because the trial court's articulation demonstrates that its balancing of the harm to the parties was overwhelmingly influenced by its improper consideration of the "spirit" of the federal disability laws. Indeed, a review of the record demonstrates that, rather than consider the harm to the plaintiff that would result from affording the defendant relief from the pet restriction,[14] the exclusive focus of the court and the parties was on whether federal law required the plaintiff to allow the defendant to keep Mellow in the apartment as a reasonable accommodation for M's alleged disability.

Several key instances during the summary process hearings suggest that the trial court's exercise of its discretion was not influenced by a proper balancing of the relative harm to the parties with respect to the enforcement of the pet restriction. At the first hearing, the trial court specifically told the defendant that if Mellow was still in the apartment at the next court appearance, she would be required to vacate. The trial court then continued the hearing for two weeks, so that the defendant could demonstrate to both the court and the plaintiff that Mellow had been removed from the apartment permanently, or that the defendant could establish that she had registered Mellow as a service animal. At the second hearing, the defendant introduced the letter and the certificate into evidence. To that end, the trial court continued the hearing for one week so that the defendant could provide the court with more information about the organization that had certified Mellow.

Finally, at the third hearing, the plaintiff's counsel focused its questioning of the defendant on whether anyone in the home was disabled, thus necessitating a reasonable housing accommodation according to a

department legal memorandum, which the plaintiff produced at this hearing. In fact, after this memorandum was produced, the trial court inquired of the plaintiff's counsel whether he believed that the defendant's letter set out a prima facie case for disability, to which the plaintiff's counsel responded in the negative. It is clear to us that the present summary process action was not tried on the equities, but rather on the merits of whether the defendant qualified for a reasonable housing accommodation under federal law. Because of the trial court's focus on whether the defendant qualified for a reasonable housing accommodation, despite having notice of an equitable defense,[15] the plaintiff did not proffer reasons grounded in equity, with supporting evidence, as to the reason for its pet restriction, and the potential harm that would come to it should the trial court rule in favor of the defendant. Further, this court may not place itself in the position of the trial court and rebalance the equities in the absence of the improper consideration of the "spirit" of the regulations. See, e.g., *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283, 649 A.2d 518 (1994) ("equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court"). Accordingly, we conclude that the plaintiff is entitled to a new hearing with regard to the defendant's equitable defense.

### III

Finally, we address the plaintiff's claim that the trial court improperly admitted the letter into evidence because it was inadmissible hearsay.[16] The plaintiff argues that the letter was not admissible pursuant to the medical treatment report exception to the hearsay rule provided by General Statutes § 52-174 (b) because that statute is limited to personal injury cases. We disagree, and conclude that the trial court properly admitted the letter into evidence pursuant to § 52-174 (b).[17]

Ordinarily, "[w]hether the trial court improperly admitted evidence under § 52-174 (b) is an evidentiary question, and our review is for abuse of discretion." *Rhode* v. *Milla*, 287 Conn. 731, 742, 949 A.2d 1227 (2008). The plaintiff's claim that § 52-174 (b) is inapplicable in this summary process case because it is limited to personal injury cases presents, however, "a question of statutory construction over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such

text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Tomick* v. *United Parcel Service, Inc.*, 324 Conn. 470, 477–78, 153 A.3d 470 (2017).

As § 1-2z requires, we begin with the text of § 52-174 (b), which provides in relevant part as follows: "In all actions for the recovery of damages for personal injuries or death, pending on October 1, 1977, or brought thereafter, and in all court proceedings in family relations matters . . . or in the Family Support Magistrate Division, pending on October 1, 1998, or brought thereafter, and *in all other civil actions* pending on October 1, 2001, or brought thereafter, any party offering in evidence a signed report and bill for treatment of any treating physician . . . psychologist, social worker, [or] mental health professional . . . may have the report and bill admitted into evidence as a business entry and it shall be presumed that the signature on the report is that of such treating physician . . . psychologist, social worker, [or] mental health professional . . . and that the report and bill were made in the ordinary course of business. The use of any such report or bill in lieu of the testimony of such treating physician . . . psychologist, social worker, [or] mental health professional . . . shall not give rise to any adverse inference concerning the testimony or lack of testimony of such treating physician . . . psychologist, social worker, [or] mental health professional . . . ." (Emphasis added.) Resolution of the plaintiff's claim that § 52-174 (b) is inapplicable in summary process cases depends on whether, for the purposes of application of the medical treatment records exception to the hearsay rule, summary process actions are "other civil actions." We conclude that they are.

Because § 52-174 (b) does not define the term "civil action," in accordance with General Statutes § 1-1 (a), "we look to the common understanding expressed in dictionaries in order to afford the term its ordinary meaning." *Lackman* v. *McAnulty*, 324 Conn. 277, 287, 151 A.3d 1271 (2016). Black's Law Dictionary defines "civil action" in relevant part as, "[a]n action wherein an issue is presented for trial formed by averment of complaint and denials of answer or replication to new matter . . . ." Black's Law Dictionary (Rev. 4th Ed. 1968). The statutory process by which eviction occurs in Connecticut is consistent with this definition. Specifically, if a tenant neglects or refuses to quit possession after having received a pretermination notice and a subsequent notice to quit; see General Statutes § 47a-23; "any commissioner of the Superior Court may issue

a writ, summons and complaint *which shall be in the form and nature of an ordinary writ, summons and complaint in a civil process . . . .*" (Emphasis added.) General Statutes § 47a-23a. At this point, the tenant may file an answer to the complaint and may allege any special defenses, a process facilitated by a standard form provided by the Judicial Branch. See Summary Process (Eviction) Answer to Complaint, Judicial Branch Form JD-HM-5; see also Practice Book § 17-30 (rule of civil practice governing default judgment for failure to appear or plead in summary process matter). After the pleadings are closed, a trial is scheduled. See General Statutes § 47a-26d. On the basis of the statute's plain and unambiguous language, we conclude that the medical treatment records exception of § 52-174 (b) applies to summary process actions.[18] Accordingly, we conclude that the trial court properly admitted the letter into evidence.[19]

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] We note that, although two other individuals residing in the apartment, "John Doe" and "Jane Doe," were also named as defendants, they are not parties to the present appeal. For the sake of convenience, we refer to Phillips as the defendant hereinafter.

[3] M is the defendant's oldest niece. She was a minor when this action was commenced, but is over the age of eighteen. In an effort to protect her privacy given the factual circumstances of this case, we refer to her as M.

[4] Although not referred to elsewhere in the record, the dog is registered as "Mellow Phillips" on the purported "Emotional Support Dog" certificate. Accordingly, we refer to the dog as Mellow.

[5] Specifically, the lease provides in relevant part as follows: "The [t]enant agrees not to . . . [h]ave pets or animals of any kind in the unit without the prior written permission of the [l]andlord, but the landlord will allow the tenant to keep an animal needed as a reasonable accommodation to the tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities . . . ."

Additionally, the plaintiff's "House Rules and Regulations" for the apartment complex provides in relevant part as follows: "No Animals or Pets are allowed in any of the units at any time; provided, however, elderly or disabled [t]enants may have a service or comfort pet of not more than thirty . . . pounds that otherwise meets [certain guidelines issued by the department]. Eviction may commence for [t]enants found in violation of this policy."

[6] General Statutes § 47a-15 provides in relevant part: "Prior to the commencement of a summary process action . . . if there is a material noncompliance by the tenant with the rental agreement or a material noncompliance with the rules and regulations adopted in accordance with section 47a-9, and the landlord chooses to evict based on such noncompliance, the landlord shall deliver a written notice to the tenant specifying the acts or omissions constituting the breach and that the rental agreement shall terminate upon a date not less than fifteen days after receipt of the notice. . . ."

[7] A copy of the lease and the plaintiff's house rules were admitted into evidence. See footnote 5 of this opinion.

[8] For a description of the letter, see part II A of this opinion.

[9] We note that the trial court originally rendered judgment for the defendant without issuing a written opinion. In response to a motion by the plaintiff after it filed the present appeal, the trial court issued an articulation containing its findings and conclusions.

[10] After the parties' briefs were filed in this appeal, the trial court, *Avallone, J.,* dismissed the plaintiff's second summary process action. This court then

sua sponte requested supplemental briefing on the mootness issue.

[11] The defendant also claims that the trial court lacked subject matter jurisdiction over this action because the defendant's pretermination notice did not comply with the requirements of federal law, namely, it did not include any information regarding the defendant's right to respond to the plaintiff within ten days of receipt of the pretermination notice as required by a department handbook. See United States Dept. of Housing and Urban Development, HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs (November, 2013), § 8-13 (B) (2) (c) (4), available at https://portal.hud.gov/hudportal/documents/huddoc?id= 43503HSGH.pdf (last visited April 24, 2017). Although not raised before the trial court, we consider this issue on appeal because a question of subject matter jurisdiction may be raised at any time. See, e.g., *Lopez* v. *Board of Education*, 310 Conn. 576, 589–90, 81 A.3d 184 (2013).

We conclude that this issue does not implicate the subject matter jurisdiction of the trial court, because the relevant provision of the department's handbook is not legally binding as a matter of federal law. In *Thorpe* v. *Housing Authority*, 393 U.S. 268, 274–76, 89 S. Ct. 518, 21 L. Ed. 2d 474 (1969), the United States Supreme Court considered whether a department-issued circular was legally binding or merely advisory. In doing so, the court looked to language in the circular, as well as letters written by the department's Assistant Secretary for Renewal and Housing Assistance and by its Chief Counsel to determine the department's intended effect for the circular. Id., 275–76. The court held that the circular was legally binding, as it set forth binding requirements necessary to fulfill federal responsibilities under a particular federal act. Id. However, the court distinguished this circular from other " 'handbooks' and 'booklets' issued by [the department that] contain mere 'instructions,' 'technical suggestions,' and 'items for consideration.' " Id., 275. Accordingly, we look to the department's intent to determine whether the relevant provision of the department's handbook is legally binding.

In the introduction of the department's handbook, § 1-1 (B) indicates that its purpose is to, inter alia, describe "the occupancy requirements and procedures governing . . . subsidized multifamily housing programs" and address "the procedures by which households apply for housing and the rights and responsibilities of in-place tenants and property owners." HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs, supra, § 1-1 (B). Although the handbook appears to describe department regulations, we conclude that the handbook itself is merely advisory because nowhere does it state that it is legally binding. See, e.g., *Fairmount Heights Associates L.P.* v. *Greystone Servicing Corp.*, United States District Court, Docket No. 3:06CV1206 (WWE) (D. Conn. August 29, 2007) (describing similar department handbook as "advisory" and concluding that "its provisions do not have the force of law and cannot be the basis of action for damages"). Accordingly, this issue does not implicate the trial court's jurisdiction.

[12] Title 29 of the United States Code, § 794, provides in relevant part as follows: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." We note that the department's regulations implementing this provision are codified in part 8 of Title 24 of the Code of Federal Regulations.

[13] We note that the regulations implementing the Americans with Disabilities Act specifically exclude emotional support animals from its definition of "service animals." See 28 C.F.R. § 36.104 ("*Service animal* means any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability . . . . [T]he provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition." [Emphasis in original.]) Accordingly, the Americans with Disabilities Act does not apply in the present case.

[14] It is of note that no testimony was presented as to the specific harm to the defendant, should a court order her to find a new home for Mellow or face eviction. The trial court, however, reasonably could have inferred that harm to the defendant from eviction would include the loss of her federally subsidized housing if evicted, and emotional harm to the children if the defendant and her family were allowed to remain on the property, but ordered to find a new home for Mellow.

[15] The defendant contends that she properly pleaded equitable nonforfei-

ture as a special defense in her answer to the plaintiff's summary process complaint. Given the broad reading that we give to pleadings, especially in light of the defendant's self-represented status at trial, we agree. "The fundamental purpose of a special defense, like other pleadings, is to apprise the court and opposing counsel of the issues to be tried, so that basic issues are not concealed until the trial is underway." (Internal quotation marks omitted.) *Almada* v. *Wausau Business Ins. Co.*, 274 Conn. 449, 456, 876 A.2d 535 (2005).

As noted previously in this opinion, the defendant pleaded the following special defense: "[T]he dog was originally mom's dog that occupied the apartment for [six] years prior to my leasing the place. Mom passed away in 2013 when I then took over residence. I have been able to keep the dog that the four children I am raising and myself have become attached to. *Once I begin complaining again about the condition of the apartment I was given [fifteen] days to get rid of dog which was unreasonable.* The dog has been given to brother on July 2, 2015. I tried to contact landlord but hasn't replied." (Emphasis added.)

"The interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . Furthermore, we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Citations omitted; internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536–37, 51 A.3d 367 (2012).

Affording the defendant, who at the time of filing her answer to the plaintiff's summary process complaint appeared as a self-represented party, appropriate solicitude; see, e.g., *New Haven* v. *Bonner*, 272 Conn. 489, 497–98, 863 A.2d 680 (2005); we agree with the defendant that she adequately pleaded a defense sufficient to apprise the plaintiff that she was asking the court to act equitably to resolve this case. Specifically, she admitted the lease violation, but averred that Mellow had been on the premises for a long time and that the plaintiff had acted unreasonably—in a manner akin to retaliatory eviction—by not taking adverse action until after she had exercised her rights to ask for repairs to the apartment. The defendant's admission in the special defense that Mellow had been in the apartment for more than six years was sufficient to alert the plaintiff that questions might be raised about why the plaintiff waited that long to enforce the pet restriction, and the related topic of the reasons underlying that clause in the lease. Indeed, nothing in the special defense indicated that the defendant had a right to keep Mellow on the premises as an accommodation under the relevant disability laws—in spirit or otherwise. Accordingly, we agree with the defendant's argument that her pleadings were sufficient to put the plaintiff on notice of the equitable nonforfeiture grounds upon which the trial court decided the present case.

[16] We address this issue, in the interest of judicial economy, because it is likely to arise on remand. See, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 646 n.14, 95 A.3d 1011 (2014).

[17] Accordingly, we need not reach the plaintiff's arguments regarding the residual hearsay exception. See Conn. Code Evid. § 8-9.

[18] We note that during oral argument before this court, counsel for the plaintiff stated that his understanding of the statute is that it only applies to personal injury cases. However, when counsel was read the full text of § 52-174 (b), he acknowledged candidly that his interpretation of the statute might be in error.

We acknowledge that this court previously interpreted § 52-174 (b) as applicable only to personal injury cases. Specifically, in *Lopiano* v. *Lopiano*, 247 Conn. 356, 380–83, 752 A.2d 1000 (1998), we considered whether § 52-174 (b), as written in 1998, applied to a dissolution of marriage case. Relying

on the purpose of the statute, which was to get "medical evidence before the jury in the absence of the treating physician," we explained that "this statutory exception [which] allow[s] for a substitute for testimony was clearly driven by economics due to the necessity for medical evidence in every personal injury action for damages." Id., 383. We concluded that there was "no such corresponding need in every dissolution action," and declined to extend § 52-174 (b) to dissolution actions. Id. We note, however, that the legislature subsequently enacted No. 01-15 of the 2001 Public Acts, which modified and expanded the scope of § 52-174 (b), to include "*all other civil actions* pending on [October 1, 2001], or brought thereafter . . . ." (Emphasis added.)

[19] We briefly address the plaintiff's contention that the trial court improperly admitted the letter because: (1) it did not have an opportunity to cross-examine Fan; (2) there was no evidence that Fan works in the same clinic as Venditti; and (3) there was no cross-examination as to the source of the signatories' knowledge about M. A review of the record reveals that the plaintiff failed to object to the letter on these grounds before the trial court. Accordingly, we decline to review these claims under the well settled principles limiting appellate review of claims alleging improper evidentiary rulings to the grounds asserted before the trial court. See, e.g., *State* v. *Taylor G.*, 315 Conn. 734, 769–70, 110 A.3d 338 (2015).