******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

*Syllabus*

The plaintiff landlords, D, C, and B Co., sought, by way of summary process, to regain possession of certain premises leased to the defendant tenants, N, S, and S Co. Since 1970, the plaintiffs' property was used as an automobile repair facility, and the plaintiffs had installed underground gasoline and waste oil storage tanks on the property but failed to follow proper protocols for their removal, which resulted in environmental contamination. Subsequently, in July, 2014, seven months after the parties entered into a lease of the property, the Department of Energy and Environmental Protection issued an enforcement order directed to B Co. and commenced a civil action that resulted in a stipulated judgment. During trial in the present case, the defendants asserted the special defense of equitable nonforfeiture and argued in their posttrial brief that they withheld rent payments because of their counsel's advice to hold the rent in escrow, because they were unaware of the contamination, and because they were concerned that one of their two businesses would not be permitted to open due to the plaintiffs' failure to extend their rent abatement period, despite the delay of the plaintiffs' property manager and leasing agent in obtaining certificates of occupancy for retail or food service uses. The trial court rendered a judgment of possession in favor of the plaintiffs, from which the defendants appealed to this court. *Held*:

1. The defendants could not prevail in their claim that the trial court applied an incorrect legal standard in determining that they failed to prove their special defense of equitable nonforfeiture: that court properly applied the doctrine of equitable nonforfeiture to the facts of this case, as it determined that the defendants, who had admitted that they deliberately stopped paying rent upon advice of their counsel because they were upset about the contamination, failed to prove the first element of the equitable nonforfeiture test, namely, that the nonpayment of rent was not wilful or grossly negligent, and the court, having made that determination, was not required to address the other elements; moreover, the court determined that the defendants failed to prove they made a good faith effort to comply with the lease or had a good faith dispute as to its meaning, and it reasonably could have reached the conclusions it did on the basis of certain testimony presented, which it was free to credit.

2. The defendants' claim that the trial court erred in finding that the plaintiffs were unaware of contamination until after July 1, 2014, was unavailing, as there was evidence in the record to support that finding; D testified that he believed any contamination detected in 2011 was within acceptable limits and that he told the defendants that there was some contamination, but if there was any problem, he would take care of it, and even if the existence of contamination on the property requiring action prior to July 1, 2014, was concealed from the defendants, the court also found that the plaintiffs had complied with their obligation under the lease and had taken care of the problem, and that the remediation had no effect on the progress of the defendants' renovations or their ability to open both of their businesses on the property, and, therefore, even if the court's finding that the plaintiffs were unaware that the tank graves contained gasoline type contaminants above action levels was erroneous, any error was harmless.

3. The defendants' claim that the trial court abused its discretion in finding that they failed to prove their special defenses of unjust enrichment and violation of the implied covenant of good faith and fair dealing was not reviewable, the defendants having failed to brief the claim adequately; the defendants' analysis appeared in a single paragraph of their brief, they did not distinguish between their third or fifth special defenses, both of which alleged a violation of the implied covenant of good faith and fair dealing, there were no legal authorities cited or an

analysis of whether the special defenses were legally viable, and the defendants did not cite any standard of review governing this court's review and inaccurately asserted that the court failed to make any factual findings as to the fourth and fifth special defenses, and that the court failed to refer to the special defenses alleging a violation of the implied covenant of good faith and fair dealing.

4. The trial court did not abuse its discretion in denying the defendants' request for a continuance so that T, an enforcement officer employed by the department, could testify: the defendants failed to make an adequate showing as to why T, who purportedly was under subpoena, was not available to testify as scheduled, or why T's deposition was not taken beforehand and offered into evidence in lieu of live testimony, they made no proffer to the court as to the necessity of T's testimony or why the denial of a continuance would impair their defense, nor did they request a capias to compel T's presence, and the court appropriately considered that counsel for the defendants moved for a continuance on the day of trial; moreover, even if the court abused its discretion, any error was harmless, because even though the defendants argued before this court that denying their request effectively kept out of evidence department documentation concerning the history of contamination on the property, the trial court considered the contamination issue to be "pretextual" and found that the defendants suffered no detriment as a result of the contamination and remediation, and that they did not offer any evidence that they complained about the issue until they filed their answer in this case, and, thus, the defendants did not demonstrate that they were harmed by the court's purported error.

Argued February 11—officially released October 1, 2019

*Procedural History*

Summary process action brought to the Superior Court in the judicial district of Stamford-Norwalk, Norwalk Housing Session, and tried to the court, *Rodriguez, J.*; judgment for the plaintiffs, from which the defendants appealed to this court; thereafter, the court, *Rodriguez, J.*, denied the defendants' motion for articulation; subsequently, this court granted in part the defendants' motion for review and the court, *Rodriguez, J.*, issued an articulation; thereafter, this court granted in part the defendants' motion for review, and the court, *Rodriguez, J.*, issued an articulation. *Affirmed.*

*Eugene E. Cederbaum*, with whom was *Ryan Driscoll*, for the appellants (defendants).

*Matthew B. Woods*, for the appellees (plaintiffs).

*Opinion*

KELLER, J. This summary process action involves a lease of commercial premises located at 936-940 Post Road East in Westport (property). The defendants, Nader Daghoghi (Nader), Sassoon Daghoghi (Sassoon) and 940 Post Road East, LLC, doing business as Savoy Rug Gallery (defendant LLC), appeal from a judgment of possession rendered in favor of the plaintiffs, Dominick Boccanfuso (Dominick), Crescienzo Boccanfuso (Crescienzo), and Boccanfuso Bros., Inc. (plaintiff corporation). The defendants claim that the trial court (1) applied an incorrect legal standard in determining that they failed to prove their special defense of equitable nonforfeiture; (2) erred in finding that the plaintiffs were unaware of environmental contamination at the property until after July 1, 2014; (3) abused its discretion in finding that the defendants had failed to prove their special defenses of unjust enrichment and violation of the implied covenant of good faith and fair dealing; and (4) abused its discretion by not granting the defendants a continuance so that a witness could testify. We affirm the judgment of the trial court.

The following facts, as stipulated to by the parties or as found by the court in its original decision or subsequent articulations, and procedural history are relevant to this appeal.

The property was owned by the plaintiff corporation, and, at all times relevant to this litigation, Dominick was a shareholder, director and officer of the plaintiff corporation. Since at least 1970 and through the date of Dominick's retirement at the end of 2013, the property was used as an automobile repair facility. In or about 1989, the plaintiffs installed a 2000 gallon gasoline underground storage tank under the front parking lot of the property. Sometime thereafter, they also installed a 330 gallon waste oil underground storage tank in the rear of the property. Both underground storage tanks were removed in 2013 for reuse elsewhere, but the plaintiffs failed to follow proper procedures and protocols for the removals.

Dominick received a letter from Absolute Tank Testing, Inc. (Absolute), dated October 31, 2011, advising him that soil samples taken from the area around the perimeter of the 2000 gallon gasoline underground storage tank contained "detectable concentrations of [Extractable Total Petroleum Hydrocarbons] 540 parts per million," and that Absolute had notified the Department of Energy and Environmental Protection (department). (Internal quotation marks omitted.)

In March, 2013, Dominick's nephew, Giuseppe Boccanfuso (Giuseppe), who was not licensed to remove underground storage tanks, removed the 2000 gallon gasoline underground storage tank. In March or April, 2014, Giuseppe removed the 300 gallon waste oil under-

ground storage tank. The department was not notified of the removal of either of the tanks. Additionally, no test of the soil surrounding the waste oil underground storage tank was conducted.

On November 22, 2013, the parties entered into a lease of the property. The five-year lease, with an option of extending the term for five additional five-year terms, provided that the defendants were to convert the property from an automobile repair facility to spaces in which they would operate their two businesses, the Savoy Rug Gallery and a Subway sandwich shop. The defendants intended to use a portion of the space to sell handmade oriental rugs and the remainder to house their Subway franchise.

Richard H. Girouard, Sr., was the leasing agent for the property and also the property manager for the Boccanfuso family. Girouard negotiated the terms and conditions of the lease and drafted it on behalf of the plaintiffs.[1]  The monthly base rent for the property was $16,338.

Prior to the signing of the lease, on October 29, 2013, Girouard, on behalf of Klein New England,[2] sent a letter to the defendants regarding the renovation of the retail space. In this letter, Girouard offered to provide the defendants consulting and design services for the demolition and renovation of the property. Two of Klein New England's undertakings were to obtain the building permits and certificates of occupancy for the retail space. The defendants paid Klein New England the $22,500 fee set forth in Girouard's letter.

On July 1, 2014, over seven months after the lease was signed, the department, after finding evidence of environmental contamination, issued an enforcement order directed to the plaintiff corporation. The department later commenced a civil action against the plaintiff corporation in the Superior Court for the Judicial District of Hartford at Hartford, alleging a violation of the enforcement order. On August 15, 2016, the court, *Hon. Susan A. Peck*, judge trial referee, rendered a judgment upon the stipulation of the parties to that action.

Paragraph 33 of the lease provides in pertinent part: "Lessor will be responsible for any environmental issues which may arise with the [d]emised [p]remises." The plaintiffs addressed the contamination issues at their expense, and the property has been remediated in accordance with the stipulation between the plaintiffs and department.

On June 11, 2014, the defendants obtained a building permit to renovate a portion of the property into the retail rug gallery, and a certificate of occupancy for that renovated space was issued on February 26, 2015.

At the direction of the plaintiffs, on June 27, 2014, Girouard informed the defendants by letter that the rent commencement date pursuant to paragraph 10 of the

lease would be July 1, 2014, and to commence payment of all water and electric charges.[3] In the letter, Girouard also informed the defendants that the plaintiffs had instructed him to handle all lease and building matters exclusively and that the plaintiffs did not want to be called or visited by the defendants about lease or building matters.

On August 1, 2014, Girouard, on behalf of Klein New England, sent a letter to the defendants regarding the renovation of the Subway space. The defendants paid Klein New England a $9000 consultation fee regarding the renovation of this space.

On September 15, 2014, the defendants obtained a building permit for the renovation of the Subway space and a certificate of occupancy was issued for that renovated space on June 5, 2015.

The defendants did not pay rent for the month of December, 2014, or make any other rent payments thereafter.[4] On January 7, 2015, the plaintiffs served the defendants with a notice to quit for nonpayment of rent when due for commercial property, thereby terminating the lease. The defendants remained in possession of the property beyond the date specified in the notice to quit. On January 17, 2015, the plaintiffs commenced this summary process action.

In their answer to the complaint, the defendants raised six special defenses. All but the first special defense, which alleged a lack of standing on the part of the plaintiff corporation, are the subjects of this appeal.

In their second special defense, the defendants alleged that the plaintiffs had violated paragraphs 14 and 33 of the lease by failing to remediate environmental contamination they caused and were aware of prior to the execution of the lease.[5] In their third special defense, the defendants alleged that the plaintiffs, by failing to remediate the environmental contamination, had violated the implied covenant of good faith and fair dealing.

The defendants' fourth special defense alleged unjust enrichment as a result of the failure of the plaintiff's property manager, Girouard, to properly oversee the extensive renovations to the property pursuant to "an agreement" he had with the defendants.[6] The defendants asserted that Girouard failed to obtain a certificate of occupancy until fourteen months after the lease was signed, which caused the defendants to pay basic and additional rent to the plaintiffs, unjustly enriching them, for a period when the defendants were unable to physically occupy any portion of the leased premises.

In their fifth special defense, the defendants alleged that, despite the failure of the plaintiffs' property manager and agent, Girouard, to properly oversee the progress of their renovations, the plaintiffs required them to pay basic and additional rent. The plaintiffs' demand

of these payments prior to the defendants' ability to physically occupy any portion of the property, they allege, was a violation of the implied covenant of good faith and fair dealing owed to them by the plaintiffs.

The sixth special defense alleged that the plaintiffs' claim for possession of the leased premises was barred by the equitable doctrine against forfeitures. This special defense, however, failed to allege or incorporate any facts. In the defendants' posttrial brief, the defendants argued to the court that their justifiable reasons for withholding of rent were due to (1) being unaware of long existent on-site contamination of the property until the fall of 2014, nine months after the lease was signed, and their concern that the Subway would not be permitted to open due to the contamination, which had not yet been remediated in breach of the plaintiffs' obligations under paragraph 33 of the lease; (2) the plaintiffs' failure to extend the rent abatement period despite Girouard's failure to obtain expediently certificates of occupancy for either the retail or food service uses; and (3) counsel's advice to hold the rent in escrow.

In their reply, the plaintiffs essentially denied the allegations contained in the defendants' special defenses.

A trial was held before the court over three days: February 2, 2016, May 19, 2016, and April 4, 2017. At the court's request, during trial on February 2, 2016, counsel for the parties acknowledged that the court, in deciding the issues, could rely on a joint stipulation that the parties had prepared and filed with the court on May 19, 2015.

On February 2 and May 19, 2016, the court chose only to hear evidence and rule on the viability of the defendants' fourth special defense, unjust enrichment. This special defense was based on the fact that the plaintiffs required the defendants to make rental payments despite the fact that Girouard, who allegedly had been acting as an agent of and on behalf of the plaintiffs, had failed to obtain necessary permits and approvals in a timely fashion. The court found that the defendants had failed to prove this special defense.[7] The court stated, "[a]ny agreement entered into between [Girouard] and the defendants . . . was entered into separate from and independent of the agreement between the plaintiffs . . . and the defendants . . . . [T]here was no control by [the plaintiffs] over the actions of [Girouard], nor was there any form of supervision, nor was there any benefit to the [plaintiffs] from the agreement between Girouard and [the defendants]. Simply put, the agreement was separate from and independent of the agreement between [the plaintiffs] and [the defendants]. The defendants . . . are free to seek, from [Girouard], any claim for damages allegedly resulting from the fit-up delays and any delay in not timely producing a certificate of occupancy. This is not the fault or

responsibility of [the plaintiffs]. The court finds that [Girouard] was acting for and solely on behalf of the defendant tenants in all of his undertakings to fit-up the property and in obtaining any certificate of occupancy."

On June 13, 2017, after hearing evidence on the plaintiff's complaint and the remainder of the defendants' special defenses, the court rendered a judgment of possession in favor of the plaintiffs. The court found that the defendants had breached the lease agreement by nonpayment of rent, and had failed to sustain their burden of proof as to their "special defense," referring only to the sixth special defense of equitable nonforfeiture. The court cited to *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, 255 Conn. 771, 627 A.2d 386 (1993), as illustrative of the "guidance needed to resolve a claim regarding equitable nonforfeiture." The defendants filed the present appeal.

On July 20, 2017, the defendants filed a motion for articulation, which the court denied without comment. On September 29, 2017, the defendants filed a motion for review of this denial of articulation with this court. This court ordered that the trial court articulate "(1) whether it considered the defendants' good faith intent to comply with the lease and their good faith dispute over the meaning of the lease in reaching its decision on the special defense of equitable nonforfeiture and, if so, how its consideration of these matters impacted its decision on the special defense of equitable nonforfeiture; and (2) whether it decided the defendants' second and third special defenses, and, if so, to articulate any findings it made in connection therewith regarding whether the plaintiffs knew of the existing environmental contamination on the property prior to the signing of the subject lease, whether the plaintiffs were responsible for that contamination and whether they disclosed the existence of the contamination to the defendants prior to the signing of the subject lease."

The trial court complied with this court's order. In an articulation dated November 21, 2017, it stated that it had "considered and rejected the defendants' claimed good faith intent to comply with the lease and also rejected the defendants' alleged good faith dispute over the meanings of the lease." The court found that the defendants were "well advised of the property and were ill advised by their counsel to withhold rent and breach their obligation to pay rent to the plaintiff[s]." With respect to the second and third special defenses, the court stated only that the defendants had "failed to sustain [their] burden of proof as to all the special defenses."

Dissatisfied with the court's articulation, on November 30, 2017, the defendants filed a second motion for review with this court, given the first articulation of the trial court. On March 20, 2018, this court issued a second order for articulation that was substantially

similar to the first order. On April 24, 2018, the trial court issued a supplemental articulation, which it corrected on April 26, 2018. The court articulated that the second and third special defenses were not proven by a preponderance of the evidence submitted at trial. The court found that "[u]ntil July 1, 2014, the plaintiffs and the defendants were unaware that the tank graves contained gasoline type contaminants above action levels. Accordingly, on November 23, 2013, the date when the lease was signed, neither party knew of the existence . . . of the contamination. . . . The plaintiffs have addressed the contamination issues at their expense and the property has been remediated in accordance with a [department] stipulation. . . . Neither the contamination itself nor the remediation thereof affected the renovation timelines of the retail space or the Subway space, nor did the contamination and remediation affect the operation of either business. . . . Not only did the property have a long history of use as an automotive repair shop, but the defendants knew this, not only because of the proximity of their businesses before moving into the property, but also because they were longtime customers of the plaintiffs. The lease obligated the plaintiffs to clean up any contamination on the property and they did so. The [defendants'] alleged concerns about the contamination are pretextual, since neither the contamination nor the remediation had any effect on the critical path of the defendants' renovations to the property. The [defendants'] real issue centers on the delays in renovation, and therefore in openings of business operations, beyond the rental grace period, thereby obligating them to pay rent under the lease and to their existing landlords. The plaintiffs were not responsible for the delays because of the following provisions of the lease, paragraphs 31 and 32. . . .[8] The defendants failed to prove that they were justified in withholding the rent because of the contamination issues affecting the [property]."

The court, in finding that the defendants had failed to prove their second and third special defenses, stated that the plaintiffs had not breached the lease in failing to remediate the contamination, as alleged by the defendants. It found that the plaintiffs promptly addressed the environmental issues affecting the exterior of the property, as required by paragraph 33 of the lease, and did not breach the implied covenant of good faith and fair dealing. The court further concluded that the defendants suffered no detriment as a result of the contamination and remediation. "They failed to offer any evidence that they ever even complained about the contamination and remediation until they filed their answer in this case on March 24, 2015." Additional facts will be set forth as necessary.

I

The defendants' first claim is that the court applied

an incorrect legal standard in determining that they failed to prove their special defense of equitable nonforfeiture. We disagree.

The plenary standard of review applies to the preliminary issue of whether the court applied the correct legal standard in evaluating this special defense. "[I]t is well established that [t]he . . . determination of the proper legal standard in any given case is a question of law subject to our plenary review . . . ." (Internal quotation marks omitted.) *Cathedral Green, Inc.* v. *Hughes*, 174 Conn. App. 608, 619, 166 A.3d 873 (2017).

With respect to the issue of whether the court committed error in applying the correct legal standard to the unique facts of the present case, we observe that a trial court's exercise of its equitable powers is governed by the abuse of discretion standard. "Any challenge to how the court exercised its equitable authority . . . is entitled to considerable deference." Id., 619–20. "Although we ordinarily are reluctant to interfere with a trial court's equitable discretion . . . we will reverse [if] we find that a trial court acting as a court of equity could not reasonably have concluded as it did . . . or to prevent abuse or injustice. . . . In reviewing claims of error in the trial court's exercise of discretion in matters of equity, we give great weight to the trial court's decision. . . . [E]very reasonable presumption should be given in favor of its correctness. . . . The ultimate issue is whether the court could reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *Presidential Village, LLC* v. *Phillips*, 325 Conn. 394, 407, 158 A.3d 772 (2017).

The defendants' sixth special defense alleged that the equitable doctrine against forfeiture barred their eviction. The burden of establishing an equitable defense in a summary process action falls on the party asserting that defense. See *Lynwood Place, LLC* v. *Sandy Hook Hydro, LLC*, 150 Conn. App. 682, 690, 92 A.3d 996 (2014) (summary process defendant had burden of proving equitable defense of laches).

"In determining whether a defendant is entitled to equitable relief from forfeiture of a tenancy, our Supreme Court has reiterated that courts should look to the test arising from its decision in *Fellows* v. *Martin*, 217 Conn. 57, 66–67, 584 A.2d 458 (1991). . . . In *Fellows*, the court clarified that, under Connecticut law, equitable defenses and counterclaims implicating the right to possession are available in a summary process proceeding. . . . The court in *Fellows* also made clear, however, that [a] court of equity will apply the doctrine of clean hands to a tenant seeking such equitable relief; thus, a tenant whose breach was wilful or grossly negligent will not be entitled to relief. . . .

"Accordingly, *Fellows* established that an equitable nonforfeiture defense can succeed only if (1) the ten-

ant's breach was not [wilful] or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury to the landlord; *and* (3) the landlord's injury is reparable. . . . This enumerated test, formulated from the holding in *Fellows*, is stated in the conjunctive, and, therefore, the failure of any prong of that test means that equitable relief is unavailable." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Cathedral Green, Inc.* v. *Hughes*, supra, 174 Conn. App. 620–21; see also *BNY Western Trust* v. *Roman*, 295 Conn. 194, 207 n.11, 990 A.2d 853 (2010) (limiting appellate review to one element of applicable conjunctive test); *Berzins* v. *Berzins*, 105 Conn. App. 648, 654, 938 A.2d 1281 (same), cert. denied, 289 Conn. 932, 958 A.2d 156 (2008).

In addition to applying the three part test enunciated in *Fellows*, our Supreme Court has also stated that "[t]he doctrine against forfeitures applies to a failure to pay rent in full when that failure is accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of a lease." *Fellows* v. *Martin*, supra, 217 Conn. 69; see also *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 778.

As to the first element of the *Fellows* test, whether the defendants' breach of the lease was wilful or grossly negligent, the defendants maintain that they justifiably withheld their rent because it was very shocking to find out about the environmental violations and contaminations—information that they assert Dominick had withheld from them. They assert that they were fearful that Subway might have revoked its franchise if it had learned about the contamination. They essentially claim that Girouard had a conflict of interest in working for the benefit of both the plaintiffs and the defendants, and that when he failed to complete the renovations in a more expedient fashion, the plaintiffs were responsible for their agent's derelictions and should have agreed to extend the rental abatement period until the defendants' businesses could occupy the property.

In addition, the defendants claim that the court failed to determine whether their failure to pay rent in full when due was accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of the lease. The defendants claim they acted in good faith given Nader's testimony that after they were informed of their nonpayment, they acted in good faith to avoid a forfeiture by informing the plaintiffs that the unpaid rent was going into an escrow account. They further indicate in support of their claim that Nader also testified that he offered to pay the money back to the plaintiffs immediately. Nader testified that the defendants "immediately" offered to pay the plaintiffs the three months of rent they had placed in escrow.

The plaintiffs argue that the defendants are not entitled to the equitable nonforfeiture defense because the

trial court properly applied the standard and found that the defendants had intentionally breached the lease by refusing to pay rent due in December, 2014, and thereafter, because of the delay in the completion of their renovations, for which paragraphs 31 and 32 of the lease held the defendants responsible. The plaintiffs maintain that the defendants' nonpayment of rent was deliberate and wilful, as they used "self-help in an effort to impose on the [plaintiffs] a unilateral extension of the rent concession period." Furthermore, the plaintiffs argue that the defendants never exemplified a willingness to comply fully with the lease and cure the full rental default because they deliberately failed to pay over $100,000 in real estate taxes and sewer charges that had accrued since the date of the January, 2014 tax installment and for which they were responsible under paragraph 7 of the lease.[9]

The court's decision rejecting the sixth special defense was set forth piecemeal. Nonetheless, in its first articulation, the court not only cited to *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 771, a case which fully discusses the defense of equitable nonforfeiture, but it properly applied the doctrine of equitable nonforfeiture to the facts of the present case. The court determined that the defendants had failed to prove the first element of equitable nonforfeiture pertaining to the absence of wilful or grossly negligent nonpayment. In finding that the defendants failed to prove the first element of equitable nonforfeiture, the court was not required to address the other two elements. The court also determined that the defendants failed to prove that they made a good faith effort to comply with the lease or that they had a good faith dispute with the plaintiff as to its meaning.

As to the first element, the defendants admit that they deliberately stopped paying the rent upon advice of their counsel. In particular, they noted that they were upset about the contamination and the plaintiffs' refusal to extend the rent abatement period due to the delay in the renovations, which they blamed on Girouard's purported conflict of interest in his capacities as both the plaintiffs' agent and the defendants' renovation consultant.

In the court's initial memorandum of decision, it cited to *Cumberland Farms*, which the defendants claim the court ignored. The court therein found that "[t]he elements necessary to sustain the defense of equitable nonforfeiture do not exist in this case because the defendant[s] caused the breach [of nonpayment of rent] intentionally.[10] That finding alone negates any finding of equitable nonforfeiture."[11] (Footnote added.) After determining that the defendants had failed to prove the first prong of the test set forth in *Fellows*—that their breach of the lease for nonpayment of rent was not wilful or grossly negligent—the court was not required

to, and did not, address the second and third prongs.[12] Later, in its first articulation in response to this court's order, the court also found that the defendants' claims of a good faith intent to comply with the lease and a good faith dispute over the meaning of the lease had not been proven.

The defendants argue that they were justified in withholding rent because they had not been informed of the existence of contamination on the property. In its corrected supplemental articulation, the court found that in an attempt to justify their intentional breach of the lease by nonpayment, the defendants raised "pretextual" concerns about their lack of knowledge of the contamination of the tank graves, and that they actually were seeking to avoid having to simultaneously pay rent to the plaintiffs and to pay the existing rents for their two businesses' prior locations because the rent concession period in the lease had expired before their renovations were completed. The court noted that the plaintiffs met all of their obligations under the lease with respect to remediating the environmental contamination, and that the contamination had no effect on the progress of the defendants' renovations. It found that the defendants failed to offer any evidence that they had ever complained about the contamination and remediation work until they filed their answer in the present case on March 24, 2015.[13] The court also concluded that the plaintiffs were not responsible for the renovation delays because paragraphs 31 and 32 of the lease imposed responsibility for repairs, replacements, alterations and improvements on the defendants.

The court further found, with respect to the defendants' claim that they were justified in withholding their rent because the plaintiffs refused to extend the commencement date for the payment of rent beyond July 1, 2014, as a result of Girouard's allegedly inefficient consulting work, that there was no evidence that Girouard delayed the progress of the renovations so as to benefit the plaintiffs. The court stated that "[b]ased upon the credible evidence presented in this matter, with regards to the fourth special defense and the reasonable inferences which may be drawn therefrom, the court finds that the defendant has failed to prove its fourth special defense.[14] Any agreement entered into between [Girouard] and the defendants, Nader and Sassoon . . . was entered into separate from and independent of the agreement between the plaintiffs . . . and the defendants . . . . The court finds that there was no control by [the plaintiffs] over the actions of . . . Girouard, nor was there any form of supervision, nor was there any benefit to the [plaintiffs] from the agreement between Girouard and [the defendants]. Simply put, the agreement was separate from and independent of the agreement between [the plaintiffs] and [the defendants]. The defendants . . . are free to seek, from [Girouard], any claim for damages allegedly resulting from

the fit-up delays and any delay in not timely producing a certificate of occupancy. This is not the fault or responsibility of [the plaintiffs]. The court finds that [Girouard] was acting for and solely on behalf of the defendant tenants in all of his undertakings to fit-up the property and in obtaining any certificate of occupancy."[15] (Footnote added.)

We have thoroughly reviewed the exhibits and the testimony of the witnesses as to the claim that the defendants were justified in withholding rent as a result of their lack of knowledge of environmental contamination or the plaintiffs' failure to extend their rent abatement as a result of Girouard's allegedly deficient consulting work. We conclude that the court, exercising its equitable authority, to which we afford considerable deference, could reasonably have reached the conclusions it did.

The court could have credited Dominick, who testified that the department in 2010 wanted him to put a leak detection device on his gasoline underground storage tank. He did not recall receiving any violation notice from the department in May, 2010. He decided to remove the two underground storage tanks rather than install any device and had his nephew do the removal work. He believed soil testing done in 2011 by Absolute, authorized by the plaintiffs, showed some contamination but it was at satisfactory levels and did not exceed acceptable limits. Dominick stated that he told the defendants that there was some contamination but if there was a problem, he would take care of it. The parties provided for that contingency in paragraph 33 of the lease.[16]

Girouard testified that when the plaintiffs received the July 1, 2014 notice from department, they asked Girouard to look into it. Girouard testified that he hired Enviro Shield to remediate any contamination, in addition to hiring a licensed environmental professional, Sherry Hartman, to supervise the project. He did not tell the defendants about the department notice. Dominick testified that the defendants never complained that the contamination related to the underground tanks interfered with their ability to renovate the property.

During his testimony, Nader indicated that he found out about the July 1, 2014 department order in the early fall of 2014, when he heard media reports and encountered Omar Z. Tyson, an enforcement officer employed by the department, on the property. He admitted that the remediation work, which began in August, 2014, did not interfere with the progress of the defendants' renovations, which had commenced in July, 2014.

Girouard indicated that he had had nothing to do with the removal of the two underground storage tanks or the testing that took place on the property between 2010 and 2013. Girouard testified that he first became

aware of the contamination on July 3, 2014, which the court could have credited.

During the discussions between the parties prior to the signing of the lease, Nader testified that Dominick and Crescienzo had recommended Girouard to assist the defendants with their renovations. Nader and Girouard negotiated the lease. In addition, Sassoon knew that Girouard was the leasing agent for the plaintiffs prior to signing the lease, having attended a meeting with Dominick and Crescienzo in September, 2013, to discuss a possible lease where Girouard was present at the plaintiffs' request. Prior to signing the lease, Nader entered into a consulting contract with Girouard to assist with the renovations on October 29, 2013, and paid him $11,250.

Girouard testified that there were a number of reasons for the delays in the issuance of the certificates of occupancy for the rug gallery and Subway spaces. Initially, the defendants did not intend to immediately renovate space for their Subway franchise because their current lease for the operation of their franchise would not expire for four more years. A preliminary drawing dated December 28, 2013, provided to the defendants by Girouard, showed no renovations for a retail food space. Prior to the signing of the lease, the defendants had not selected a contractor for the renovation work. The Westport Architectural Review Board (board) slowed the progress of the renovations due to its concern about the exterior design. Girouard had to attend three hearings, and the board's requirements for the exterior added to the cost. Girouard thereafter obtained three different contractors' proposals. He denied that he ever estimated the cost of the renovations or the amount of time needed for their completion for the defendants. The defendants were not satisfied with any of the three proposals. Ultimately, the defendants, after having two other contractors bid for the job, one of which, Alpha Additions, would not set a price, hired MK Remodeling, which estimated that it would cost $420,000 just to renovate the retail space for the rug store.

There were additional costs for electrical, plumbing, fireproofing, exterior doors and heating, ventilation, and air conditioning. The defendants obtained a building permit only for the rug gallery retail space on June 11, 2014.

On May 28, 2014, and June 27, 2014, the defendants received two letters from Girouard, which he had written on behalf of the plaintiffs. The letters identified Girouard as "Boccanfuso Family Property Manager, 611 Riverside Avenue, Westport."[17] The first letter reminded the defendants that pursuant to paragraph 10, rent for the property was due on June 1, 2014, and that payment of utilities for the property should be assumed by then.

The June 27, 2014 letter addressed to the defendants rejected revising the lease as suggested in a letter from the defendants' attorney to Girouard. Girouard advised the defendants that Dominick and Crescienzo had granted them an additional one month rent concession, but that the July, 2014 rent was due by July 10. He reminded them again that the utilities must be assumed by them and put in their business' name. The letter concluded with a paragraph that stated that the individual plaintiffs did not want to be called or visited at their residences or places of business by the defendants, and that Girouard would exclusively handle all future lease and building matters on their behalf. On July 1, 2014, Dominick and Crescienzo sent a letter to the defendants indicating that Girouard had made them aware of the defendants' desire to meet concerning the lease. The brothers indicated that they no longer wanted to be involved in any discussions concerning the lease and that no further concessions of any kind would be granted. They stated that they were fully expecting rental payments starting July 1, 2014, and that all matters concerning the lease were to be handled exclusively by Girouard. Although the defendants also were to pay the property taxes and sewer charges for the property as part of the rent, they never did so.

In July, 2014, after Girouard had sent the letters to the defendants on behalf of the plaintiffs demanding that they commence paying rent and utilities, Nader discussed with Girouard that the defendants had decided to begin renovating the space for the Subway. The addition of the Subway space required more extensive sewer work and the addition of sidewalks.

Despite their purported resentment toward Girouard and the plaintiffs for the delays which they claim were attributable to Girouard, and the failure of the plaintiffs to grant them a further extension of the rent abatement period, on August 1, 2014, the defendants again agreed to hire Girouard as their consultant to assist in the renovation of the retail space for the Subway. For this work, they agreed to pay Girouard $9000. At this point, the defendants were fully aware that Girouard served as both a property manager and leasing agent for the plaintiffs.

Sassoon testified that by the end of 2014, Girouard was no longer communicating with the defendants, and that the defendants stopped paying rent as an "act of desperation" because they were then paying three rents, but had not yet occupied the property. Sassoon admitted that they did not pay rent beginning in December, 2014, which led to the plaintiffs' commencement of this action.

Sassoon testified inconsistently. He first testified that the defendants informed Girouard that they wanted to bring both businesses, the rug gallery and the Subway,

under the same roof as soon as the lease was signed, but later admitted that the consulting agreement they entered into with Girouard on October 28, 2013, did not include renovation of the Subway space.

Dominick testified that he was uninvolved with the consulting arrangements Girouard had with the defendants or with their contractors. This was confirmed by Girouard. Dominick indicated that Girouard was never the property manager for the property the defendants leased.

Affording the court every reasonable presumption in favor of upholding its decision, we conclude that the court, on the basis of the facts and the reasonable inferences drawn from them, did not abuse its discretion in applying the doctrine of equitable nonforfeiture. The court indicated it understood the parameters of the doctrine and properly determined that the defendants failed to prove the first *Fellows* element, that their withholding of the rent was not wilful or grossly negligent, and that the defendants failed to prove that they made a good faith effort to comply with the lease or that a good faith dispute as to the meaning of any of its terms existed.[18] Accordingly, the defendants have failed to demonstrate that the court improperly chose or applied the law on equitable nonforfeiture.

II

The defendants' next claim is that the court erred in finding that the plaintiffs were unaware of environmental contamination on the property until after July 1, 2014.[19] We disagree.

When reviewing findings of fact, we defer to the trial court's determination unless it is clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Dunbar*, 188 Conn. App. 635, 641, 205 A.3d 747, cert. denied, 331 Conn. 926, 207 A.3d 27 (2019).

The defendants argue that Dominick had withheld information about environmental contamination on the property prior to the date that they signed the lease, justifying their withholding of their rental payments, as well as supporting their second and third special defenses that the plaintiffs had breached paragraphs 14 and 33 of the lease and violated the implied covenant of good faith and fair dealing.

The court found that "[u]ntil after July 1, 2014, the plaintiffs and the defendants were unaware that the tank graves contained gasoline-type contaminants above action levels. Accordingly, on November [22],

2013, the date when the lease was signed, neither party knew of the existence . . . of the contamination." As a result, the court found no merit to the defendants' second and third special defenses.

Our review of the testimony and other evidence related to the environmental contamination issues, which we discuss in part I of this opinion, reveals that there was evidence in the record to support the court's finding that the plaintiffs were unaware of contamination levels requiring action on the property until after July 1, 2014. Dominick testified that he believed any contamination detected in 2011 was within acceptable limits and that he told the defendants that there was *some* contamination, but if there was any problem, he would take care of it.

Moreover, even if the existence of contamination on the property requiring action prior to July 1, 2014, was concealed from the defendants, the court also found that the plaintiffs had complied with their obligation under paragraph 33 of the lease and had taken care of the problem. Furthermore, the court found that the remediation had no effect on the progress of the defendants' renovations or their ability to open both of their businesses on the property. The court stated that the plaintiffs had addressed the contamination issues at their expense and the property had been remediated in accordance with the stipulation between the department and the plaintiffs.

Accordingly, even if the court's finding that the plaintiffs were unaware that the tank graves contained gasoline type contaminants above action levels was erroneous, such an error would be harmless, as the plaintiffs complied with their obligation under the lease to remedy the conditions. Neither the contamination nor the remediation process had any effect on the defendants' use of the property or the progress of their renovations. Therefore, the court properly concluded that the contamination did not justify the defendants' nonpayment of rent.

III

The defendants' third claim is that the court abused its discretion in finding that they had failed to prove their special defenses of unjust enrichment and violation of the implied covenant of good faith and fair dealing. We decline to reach the merits of this claim because it is inadequately briefed.

It is well established that "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Fowler*, 178 Conn. App. 332, 345, 175 A.3d 76 (2017), cert. denied, 327 Conn. 999, 176 A.3d 556 (2018).

The defendants' analysis of this claim appears in a single paragraph of their brief. Moreover, in referring to their special defense alleging a violation of the implied covenant of good faith and fair dealing, the defendants do not distinguish between their third or fifth special defenses, both of which allege a violation of the implied covenant of good faith and fair dealing. There are no legal authorities cited, let alone any analysis of whether the special defenses at issue were legally viable. We note, as well, that the defendants do not cite to any standard of review that governs our review of this claim.[20]

Moreover, in their scant analysis of this claim, the defendants inaccurately assert that the court failed to make any factual findings as to the fourth and fifth special defenses.[21] The defendants also inaccurately assert that the court failed to refer to the special defenses alleging a violation of the implied covenant of good faith and fair dealing.[22] On the basis of the foregoing, we decline to review the merits of this claim.

IV

The defendants' final claim is that the court abused its discretion by not granting the defendants a continuance so that Tyson, an enforcement officer employed by the department, could testify on their behalf. We disagree.

The following additional facts are relevant to this claim. At the beginning of the hearing on April 4, 2017, which was a Tuesday, counsel for the defendants indicated to the court that he had subpoenaed one witness, a "state employee," whom he anticipated would testify on Thursday. The court responded that the case had been scheduled for "today" for quite some time; counsel for the defendants knew the Stamford-Norwalk Housing Session sits on alternate days, Tuesdays and Thursdays; and the court had a lot of other cases going forward. The court noted that counsel had not requested permission from the court for a later date, there had been "many, many meetings" and hearings concerning the case, and it was one of the oldest summary process cases in the Norwalk Housing Session. The court stated, "it's going forward without any further delay." The court, however, then stated, "we'll see what happens with . . . the evidence," and then it would make a ruling on the defendants' request.

Counsel for the defendants then stated that he thought the case had been scheduled for Tuesday *and* Thursday. The court stated, "[t]his case has not been designated to be a two day trial. Be very clear about that." Counsel for the defendants replied, "[a]t the first break, Your Honor, I will call the witness and see if he can be here this afternoon."

The plaintiffs then put on their case for summary process. During the defendants' presentation of the tes-

timony of Nader, counsel for the defendants advised the court that he had attempted to call the witness from the department: "I've called him on cell phone and I've called him at his office desk. I have not heard back from him and I will call him now again." The court stated, "I want to make the record pretty clear. At no time were you told by the clerk's office that you would have Thursday to continue with this trial. It's completely inconsistent with how we do business because again as I said earlier, we work on Tuesdays and Thursdays in Norwalk and time is very scarce in terms of having a contested hearing."

Nader finished testifying just before the lunch break. Counsel for the defendants indicated to the court that he would be calling Sassoon to testify after lunch. The court stated, "And that will conclude, assuming you don't locate the individual that you . . . ." Counsel for the defendants indicated he would do his best, and the court responded, "Well I'm not going to hear it if he's not here. Just be very clear. This is it. This is your day. I'm not going to continue this case. It's been dragging and dragging and dragging very, very long, as I said earlier."

After the lunch recess, the defendants continued with their presentation of their case, and Sassoon gave brief testimony. After Sassoon finished testifying, the court stated, "I'm not going to entertain any continuance request for any witness who's out there on the road or whatever, [defense counsel]. And I don't know if I'm really going to need testimony from someone from the [department] based on what I've heard in this case." Counsel for the defendants did not respond to this statement.

The court then discussed a date for the filing of simultaneous posttrial briefs in lieu of closing arguments. At the conclusion of the hearing, the court inquired of both the plaintiffs' and the defendants' counsel if there was anything else. Counsel for the defendants replied, "[t]hank you, Judge. Nothing else."

We briefly set forth the standard of review. "The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . .

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial

judge at the time the request is denied. . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis. . . .

"Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the [defendants'] personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the [defendants'] ability to defend [themselves]. . . . We are especially hesitant to find an abuse of discretion where the court has denied a motion for continuance made on the day of the trial . . . .

"Lastly, we emphasize that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Internal quotation marks omitted.) *State* v. *Godbolt*, 161 Conn. App. 367, 374–75, 127 A.3d 1139 (2015), cert. denied, 320 Conn. 931, 134 A.3d 621 (2016).

For several reasons, we conclude that the defendants have not demonstrated that the court abused its discretion by denying their request for a continuance in an over three year old summary process case for the purpose of presenting Tyson's testimony. April 4, 2017, was the third day of a trial in an action that had been commenced in January, 2015. On April 4, 2017, the defendants failed to make an adequate showing as to why Tyson, purportedly under subpoena for that day, was not available to testify as scheduled, or why his deposition could not have been taken beforehand and offered into evidence in lieu of live testimony.[23] The defendants made no proffer to the court as to the necessity for Tyson's testimony or why the denial of a continuance would substantially impair their defense. Certainly, they are unable to advance any such theory of relevance for the first time before this court.[24] They also made no request for a capias to compel Tyson's presence. Finally, it was appropriate for the court to consider the timing of the request and the fact that the defendants' counsel moved for a continuance on the day of trial. See, e.g., *State* v. *Godbolt*, supra, 161 Conn. 375–76 (late hour of request weighed in favor of court's denial of request for continuance).

Moreover, we conclude that, even if the court did abuse its discretion in refusing to grant a continuance for the presentation of Tyson's testimony, any error

was harmless. The defendants argue before this court that failing to grant the request for a continuance had the effect of excluding Tyson's testimony, which "effectively kept out of evidence extremely relevant [department] documentation concerning the history of contamination on the [plaintiffs'] property." In discussing the prejudice they allegedly suffered as a consequence of the court's ruling, however, the defendants do not address the significance of the fact that the court considered the environmental contamination issue to be "pretextual." As the court found, "[t]he defendants suffered no detriment as a result of the contamination and remediation. They failed to offer any evidence that they ever even complained about the contamination and remediation until they filed their answer in this case on March 24, 2015." The defendants have not demonstrated that the court's rationale in this respect was flawed and, thus, are unable to demonstrate that they were harmed by the court's purported error. We therefore reject the defendants' claim that the court abused its discretion by not granting their request for a continuance in order to call Tyson as a witness.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Nader negotiated the lease on behalf of the defendants.

[2] The letter is on the stationery of "Klein New England." Sassoon testified that Girouard operates under another company called Klein New England and that he and that business were one and the same. Girouard testified that he had purchased a business known as Victor Klein Associates, a business and restaurant brokerage firm, in 1996, and that he sent his proposals to the defendants for his consulting work on Klein New England stationery.

[3] Paragraph 10 of the lease provides in pertinent part: "Rent shall commence on the date (the 'Rent Commencement Date') which is the earlier of (a) the date the [l]essee opens for business to the public or (b) the 180th day after a fully executed [l]ease is delivered to the [t]enant." The 180th day following the execution of the lease occurred on May 21, 2014. On May 29, 2014, the individual plaintiffs met with the individual defendants and Girouard and agreed to extend the 180 day rent abatement period for an additional one month and one week. The defendants commenced paying rent in July, 2014.

[4] Apart from three missed rental payments for December, 2014, January, 2015, and February, 2015, the defendants claim, and the plaintiffs do not dispute, that pursuant to a court order, they deposited monthly payments of $16,388 with the clerk of the court for use and occupancy. The defendants, however, initially objected to paying any use and occupancy fees.

[5] Paragraph 14 of the lease provides: "Quiet Enjoyment. Lessor covenants with the said [l]essee that it has good right to lease said premises in manner aforesaid and that it will suffer and permit said [lessee] (it keeping all the covenants on its part, as hereinafter contained) to occupy, possess and enjoy said premises during the term aforesaid, without hindrance or molestation from it or any person claiming by, from or under it."

Paragraph 33 of the lease provides: "Lessor's Work. Lessor will be responsible for any environmental issues which may arise with the [d]emised [p]remises. Lessor will also be obligated to remove the hydraulic lifts in a timely manner."

[6] The evidence actually revealed that the defendants entered into two consulting agreements with Girouard, one in October, 2013, and another in August, 2014.

[7] The court did not provide a written ruling that specifically addressed the merits of the related fifth special defense, which alleged that the plaintiffs breached the implied covenant of good faith and fair dealing by insisting on rental payments before Girouard had completed renovations of either space. Neither party filed a motion for articulation addressing the fifth

special defense. The court did, however, in its first articulation, find that the defendants "had failed to sustain [their] burden of proof as to *all* the special defenses." (Emphasis added.)

The fifth special defense is derivative of the fourth special defense, because the fourth special defense alleged that the plaintiffs, despite knowledge of Girouard's failure to obtain the necessary permits and approvals, required the defendants to commence paying rent, thereby breaching the implied covenant of good faith and fair dealing. The court found that there was no agreement between the plaintiffs and the defendants with respect to any expectations as to Girouard's performance of his consulting agreements with the defendants as to the renovations. It concluded that there was only a separate and independent agreement between Girouard and the defendants.

We note that a breach of the implied covenant of good faith and fair dealing can only occur when there is already a contract, i.e., an enforceable obligation, because "[t]he implied covenant is derivative, that is, it does not create or supply new contract terms but grows out of existing ones." (Internal quotation marks omitted.) *Goldwater* v. *Ollie's Garage*, Superior Court, judicial district of New Haven, Docket No. CV-94-0357372 (June 5, 1995); see also *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 638, 804 A.2d 180 (2013) ("*the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing*" [emphasis in original; internal quotation marks omitted]); *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000) (same). We conclude that in finding that the plaintiffs were under no contractual obligation to monitor or control the activities Girouard performed for the defendants, the court impliedly applied those factual findings in rejecting the defendants' fifth special defense.

[8] Paragraph 31, titled "Maintenance of Leased Premises," states: Lessee agrees to take good care of and maintain the [l]eased [p]remises in good condition throughout the term of the [l]ease.

"Lessee, at his expense shall make all necessary repairs and replacements to the [l]eased [p]remises, including the repair and replacement of pipes, electrical wiring, heating and plumbing systems, fixtures and all other systems and appliances and their appurtenances. The quality and class of all repairs and replacements shall be equal to or greater than the original worth. If [l]essee defaults in making such repairs or replacements, [l]andlord may make them for [l]essee's account, and such expenses will be considered [a]dditional [r]ent."

Paragraph 32, titled "Alterations and Improvements," states: "Lessee shall not make any alterations or improvements to, or install any fixtures on the [l]eased [p]remises without [l]andlord's prior written consent. If such consent is given, all alterations and improvements made, and fixtures installed by [l]essee shall become [l]andlord's property at the end of the [l]ease term. Landlord may, however, require [l]essee to remove such fixtures, at [l]essee's expense, at the end of the [l]ease term.

"All alterations and improvements to the [p]remises are the [l]essee's sole responsibility. All expenses and costs associated with the required zoning change of use are the [l]essee's sole responsibility."

[9] Paragraph 7 of the lease provides: "Taxes. From and after the [r]ent [c]ommencement [d]ate, and for and during the remaining [t]erm(s) of this [l]ease, [l]essee hereby covenants and agrees to pay as [a]dditional [r]ent the [d]emised [p]remises annual real estate and sewer taxes in lawful money of the United States. Lessor shall furnish [l]essee copies of the municipal tax statements. Penalties for late payments are the sole responsibility of the [l]essee."

[10] "Whether a party's conduct is wilful is a question of fact." *Saunders* v. *Firtel*, 293 Conn. 515, 530, 978 A.2d 487 (2009). Wilful commonly means intentional or deliberate, as opposed to accidental. Id., 531. At times, the term has been used to describe conduct deemed highly unreasonable or indicative of bad faith. Id. Although the term is subject to multiple meanings, reviewing some of the court's explicit findings, such as its finding that the claims regarding the contamination were "pretextual," and not raised until after this action was commenced, in addition to finding that it had rejected "the defendants' claimed good faith intent to comply with the lease and . . . alleged good faith dispute over the [meaning] of the lease," we conclude that the court used the term to mean highly unreasonable or in bad faith.

[11] In *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, supra, 225 Conn. 777, the trial court determined, and our Supreme Court agreed, that a tenant was entitled to equitable relief from forfeiture in light of the fact that there

had been confusion on the part of the tenant about the identity of the landlord and where to send the rental payments, and the tenant had diligently sought to obtain necessary calculations from a confused landlord as to the amount it owed the landlord.

[12] The defendants argue that the court, in rendering its decision, failed to consider the second and third elements of the equitable nonforfeiture test that pertain to whether, upon eviction, the defendant would suffer a loss wholly disproportionate to the injury to the plaintiffs and whether the plaintiffs' injuries were reparable. The court made no findings as to the nature of any losses the defendants would suffer upon eviction or whether the plaintiffs' injuries were reparable. See, e.g., *Fellows* v. *Martin*, supra, 217 Conn. 66–67. Although the parties have briefed the issue of whether the evidence proved the second and third elements of the equitable nonforfeiture test, we see no need to address those additional arguments raised in connection with the present claim.

[13] As of March, 2015, the defendants had obtained certificates of occupancy for both businesses.

[14] These findings also pertain to the fifth special defense. See footnote 8 of this opinion.

[15] We agree with the plaintiffs that the defendants' claim appears to be based on the doctrine of constructive eviction, a doctrine that would not permit them to withhold rent payment yet remain in possession of the property. "[A] constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent. . . . In addition to proving that the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord, (2) the tenant vacated the premises because of the problem, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem." (Citation omitted; internal quotation marks omitted.) *Heritage Square, LLC* v. *Eoanou*, 61 Conn. App. 329, 332, 764 A.2d 199 (2001).

[16] We note that there is no provision in the lease in which the plaintiffs warranted to the defendants that no environmental contamination on the property existed.

[17] Dominick had testified that Girouard was not the property manager for his garage at the property, although he did negotiate the lease for the plaintiffs. Dominick stated that Girouard was the property manager for other properties the plaintiffs owned, including 611 Riverside Avenue in Westport.

[18] The defendants, in their brief, do not enlighten us as to any dispute between the parties as to the meaning of any particular provision of the lease, nor do they question the court's ultimate interpretation of any of its relevant provisions. They also fail to adequately brief their argument that their withholding of rent upon the advice of counsel satisfies the requisite proof for the defense of equitable nonforfeiture set forth in *Fellows*. We consider both of these unarticulated arguments in their first claim to be abandoned.

[19] The defendants misrepresent the court's actual finding on the issue of existing contamination on the property before July 1, 2014. The court's actual finding was that the parties were "unaware that the tank graves contained gasoline type contaminants *above action levels*." (Emphasis added.)

[20] The defendants' statement of the claim suggests that the abuse of discretion standard of review applies, yet the issue of whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review, as we previously cited in part I of this opinion. See *Strouth* v. *Pools by Murphy & Sons, Inc.*, 79 Conn. App. 55, 59, 829 A.2d 102 (2003).

[21] The defendants ignore the court's oral ruling, at the conclusion of the second day of trial on May 19, 2016, in which it ruled on the viability of the fourth special defense pertaining to the delays in the property renovations allegedly caused by Girouard. We are particularly perplexed by this omission because the defendants included a copy of the signed transcript containing the court's factual findings relevant to the fourth special defense in the appendix to their appellate brief.

[22] In its original order, its first articulation, and its corrected supplemental articulation, the court specifically found that the defendants had failed to prove their third special defense.

[23] In the appendix of their brief to this court, the defendants have provided

a copy of the subpoena served on Tyson. It reflects that he was served by a state marshal on March 29, 2017, to appear on Tuesday, April 4, 2017, not Thursday, April 6, 2017. It would appear that, prior to April 4, 2017, the defendants, with the exercise of due diligence, could have ascertained whether Tyson would appear and could have apprised the court of a problem with Tyson's compliance.

[24] The defendants argue in their brief that the court's denial of a continuance "effectively kept out of evidence extremely relevant [department] documentation concerning the history of contamination . . . and Tyson's . . . repeated contact with Dominick . . . ." The defendants, however, made no proffer whatsoever to the trial court as to what evidence Tyson might have contributed in support of their defense.

---