******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DOMINICK BOCCANFUSO ET AL. *v.*
NADER DAGHOGHI ET AL.
(SC 20397)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff landlords sought to regain possession of certain real property
from the defendant tenants on the ground of nonpayment of rent. The
parties had executed a commercial lease for the property. The property
previously had been used as an automobile sales and repair facility, but
the defendants intended to operate a retail rug gallery and a restaurant
on the premises. The defendants started making monthly rent payments
but stopped approximately five months later. At that time, the defendants
had not completed their planned renovations to the premises and had not
obtained the certificates of occupancy required to open the businesses.
Meanwhile, without informing the defendants, the plaintiffs had been
remediating the property of certain environmental contamination in
accordance with a stipulated judgment with the Department of Energy
and Environmental Protection. After the defendants failed to pay rent
for three consecutive months, the plaintiffs served them with a notice
to quit, and, when the defendants failed to vacate the premises, the
plaintiffs commenced this summary process action. The defendants
asserted several special defenses, including equitable nonforfeiture. At
trial, two of the defendants testified that the defendants had stopped
paying rent because it was the only way they could stay in business
and to draw the plaintiffs' attention to their difficulties. The trial court
rendered judgment of possession for the plaintiffs, concluding, inter
alia, that the equitable nonforfeiture defense did not apply because the
defendants had intentionally breached the lease. Specifically, the court
rejected the defendants' claims that they had a good faith intent to
comply with, and a good faith dispute over the meaning of, the lease. The
court found that the defendants' alleged concerns about environmental
contamination, which the defendants claimed justified their withholding
of rent, were pretextual, and that the defendants' nonpayment actually
was motivated by the costs and difficulties arising from the delay in
renovating and occupying the premises. The Appellate Court affirmed
the trial court's judgment, and the defendants, on the granting of certifi-
cation, appealed to this court. *Held* that the trial court did not abuse
its discretion in rejecting the defendant's equitable nonforfeiture
defense, and, accordingly, the Appellate Court properly affirmed the
trial court's judgment; because the defendants intentionally withheld
rent on pretextual grounds and in the absence of any good faith dispute
over the terms of the lease, it was within the trial court's equitable
discretion to determine that the defendants acted wilfully in not paying
rent and to deny them equitable relief from forfeiture of the premises.

Submitted on briefs May 8—officially released September 30, 2020**

*Procedural History*

Summary process action, brought to the Superior
Court in the judicial district of Stamford-Norwalk,
Housing Session at Norwalk, and tried to the court,
*Rodriguez, J.*; judgment for the plaintiffs, from which
the defendants appealed to the Appellate Court; there-
after, the court, *Rodriguez, J.*, issued articulations of
its decision; subsequently, the Appellate Court, *Keller,
Prescott* and *Pellegrino, Js.*, affirmed the trial court's
judgment, and the defendants, on the granting of certifi-
cation, appealed to this court. *Affirmed.*

*Ryan P. Driscoll* filed a brief for the appellants

(defendants).

*Matthew B. Woods* filed a brief for the appellees (plaintiffs).

*Opinion*

ECKER, J. The issue in this certified appeal is whether the trial court properly rejected the defendants' claim that the doctrine of equitable nonforfeiture should have operated to prevent their eviction in a summary process action for nonpayment of rent under the terms of a commercial lease. The defendants, Nader Daghoghi (Nader), Sassoon Daghoghi (Sassoon), and 940 Post Road East, LLC, doing business as Savoy Rug Gallery, appeal from the judgment of the Appellate Court, which affirmed the trial court's judgment of possession rendered in favor of the plaintiffs, Dominick Boccanfuso (Dominick), Crescienzo Boccanfuso, and Boccanfuso Bros., Inc. (plaintiff corporation). The defendants claim that the Appellate Court improperly affirmed the judgment of the trial court denying the defendants equitable relief from forfeiture of their tenancy. We affirm the judgment of the Appellate Court.

I

The following facts[1] and procedural history are relevant to this appeal. The plaintiff corporation owns commercial property located at 936-940 Post Road East in Westport. From 1970 until January 14, 2014, the premises were used as an automotive repair and sales shop. Two underground storage tanks were located on the property: a 2000 gallon tank used to store gasoline and a 330 gallon tank used to store waste oil.

On May 4, 2010, an inspector from the Department of Energy and Environmental Protection (DEEP)[2] conducted a compliance inspection of the 2000 gallon tank. The inspector found that an automatic tank gauging system and probes needed to be installed and that "no annual cathodic protection test [is] being conducted on the tank and associated product line piping." The inspector's report identified nine "potential violations" of state law on the basis of these findings. On July 15, 2010, the DEEP inspector conducted a "[f]ollow-up" compliance audit during which the inspector informed the plaintiffs that the cathodic protection of the tank needed to be tested annually. The inspector's report indicated that one of the plaintiffs "stated [that] he will call [a] contractor and inform me who[m] he selected to [test the cathodic protection]." On March 3, 2011, a second DEEP inspector found that the violations had not been addressed. The inspector had a conversation with Dominick, during which Dominick stated that he would hire a contractor to test the tank and piping for corrosion protection. The inspector informed Dominick that the tank was in "temporary closure status" until it was either brought into compliance or permanently removed. (Internal quotation marks omitted.) The inspector cited six "potential violations" on the basis of his findings.

On April 27, 2011, the plaintiffs hired Absolute Tank

Testing, Inc. (Absolute Tank), to conduct a cathodic protection test of the 2000 gallon tank. Absolute Tank subsequently sent a letter to Dominick on May 1, 2011, advising him that the tank had "passed" the test but that the lines connected to the tank had "fail[ed]" the test. Absolute Tank recommended that the plaintiffs retain a cathodic protection engineer to confirm the readings and make recommendations accordingly. On October 31, 2011, Dominick received a second letter from Absolute Tank advising him that soil samples taken from the area surrounding the 2000 gallon tank contained "detectable concentrations of [Extractable Total Petroleum Hydrocarbons at] 540 parts per million" and that DEEP had been notified.[3]

In March, 2013, Giuseppe Boccanfuso (Giuseppe), Dominick's nephew, removed the 2000 gallon tank. Afterward, Connecticut Tank Removal, Inc. (Connecticut Tank), conducted soil sampling of the area where the tank had been located. The sample "indicate[d] elevated levels of contaminants . . . ." Approximately one year later, in March or April of 2014, Giuseppe removed the 330 gallon tank, as well. Giuseppe was not licensed to remove these tanks, and neither he nor the plaintiffs notified DEEP of their removal.

Meanwhile, in 2012, the parties began discussing a potential lease of the premises and the defendants' intention to operate a retail rug gallery and a Subway sandwich restaurant thereon. The parties agreed that the defendants would make significant renovations to the premises in preparation for operating these businesses. To undertake these renovations, the defendants were required to obtain building permits and certificates of occupancy for each business. At some point during the discussions over the proposed lease, Nader asked Dominick whether any environmental contamination was present on the property. Nader and his brother Sassoon had experienced environmental issues in the past with a different property that, like the premises at issue, also had been an automobile repair business, and they wanted to ensure there would be no similar problems with the leased premises. Dominick did not inform Nader of the presence of the tanks, the results of the DEEP inspections, the testing performed by Absolute Tank, or any potential contamination on the site.[4]

Richard H. Girouard, Sr., the property manager for the plaintiffs, served as the leasing agent for the premises. Girouard drafted and negotiated the terms of the lease on behalf of the plaintiffs. In addition, distinct from his role as the plaintiffs' leasing agent, Girouard offered to consult with the defendants regarding the renovation and permitting of the premises. Prior to the execution of the lease, the defendants and Girouard memorialized, in a letter dated October 29, 2013, their agreement that Girouard would provide "consulting [and] design ser-

vices" for the renovations and permitting process.[5] These services included "[a]ssist[ing] [the] owners[6] in overseeing demolition [and] renovation of [the premises]," "[s]chedul[ing] and oversee[ing] necessary inspections," facilitating the "[p]ermitting process for [e]ngineering, [b]uilding, [z]oning [and] [f]ire [d]epartments," and "[p]repar[ing] for permits, inspections, etc." (Footnote added.) The defendants agreed to pay Girouard $22,500 for these services.

On November 22, 2013, the parties entered into a lease for the premises. The term of the lease was for five years, with an option to extend for five additional five year terms. Under the lease, the defendants would assume "the sole responsibility for all expenses and costs associated with the [p]remises . . . ." The lease provided, however, that the plaintiffs were "responsible for any environmental issues which may arise with the [premises]." The monthly rent was $16,388, payment of which would commence on the earlier of (1) the date on which the defendants opened for business, or (2) the 180th day after a fully executed lease was delivered to the defendants.

After the execution of the lease, the defendants began preparations to renovate the premises. In December, 2013, Girouard provided renovation plans to the defendants, which they approved. Girouard also solicited bids from prospective contractors for the renovation project. As work on the renovations progressed, Girouard signed applications for the relevant permits and had discussions with various officials, including representatives of Westport's planning and zoning, conservation, and engineering departments.

The 180th day following the delivery of the executed lease to the defendants occurred on May 21, 2014. At that point, no building permit for the retail rug gallery or the Subway restaurant had yet been issued. Consequently, no construction renovations had begun. On May 28, 2014, Girouard sent a letter to Nader and Sassoon indicating that the first rent payment was due on June 1, 2014. Thereafter, the plaintiffs agreed to grant the defendants a five week rent concession. In a letter dated June 27, 2014, Girouard informed the defendants that the first rent payment was due by July 10, 2014. Girouard also informed the defendants that the plaintiffs wanted Girouard to "exclusively handle all future lease and building matters and do not want to be called or visited at their residences or place of business." In a letter dated July 1, 2014, the plaintiffs informed the defendants that "[n]o further concessions of any kind will be granted and [the plaintiffs] are fully expecting rental payments to begin July [1]." The defendants made the July rent payment and continued paying rent through November, 2014.

On June 11, 2014, the defendants obtained a building permit for the retail rug gallery portion of the premises.

Renovations on that portion of the site began some time in July, 2014. On July 1, 2014, however, DEEP issued an enforcement order finding environmental contamination on the property based on the results of the tests performed by Absolute Tank and Connecticut Tank. The order expressed DEEP's conclusion that "an unpermitted discharge has occurred at the [s]ite, constituting violations of [state regulations and state law]," and ordered the plaintiffs to retain a licensed environmental professional to oversee the remediation of the contamination. The plaintiffs did not notify the defendants of DEEP's order. The plaintiffs addressed the contamination at their own expense, and the property was remediated in accordance with a stipulated judgment that had entered in a separate civil action commenced by DEEP against the plaintiff corporation.

A letter dated August 1, 2014, memorialized a second agreement between Girouard and the defendants for "additional services to be rendered" on the Subway portion of the premises. This letter established that Girouard would procure various approvals and permits, including planning and zoning approval, for modifications made to the previously approved building plans. Girouard would also "[o]btain planning [and] zoning approval for retail food use." In exchange, the defendants would pay Girouard an additional $9000.

On September 15, 2014, the defendants obtained a building permit for the Subway portion of the premises. The defendants continued to pay monthly rent through November, 2014, but stopped paying rent in December. At that point, the renovations of the premises remained incomplete, and the defendants, through Girouard, still had not yet obtained certificates of occupancy for either the retail rug gallery or the Subway portions of the premises. The defendants also failed to pay rent in January and February, 2015. On January 7, 2015, the plaintiffs served a notice to quit on Sassoon, thereby terminating the lease.

Despite the notice to quit, the defendants did not vacate the premises. Renovations continued, and the defendants obtained a certificate of occupancy for the rug gallery portion of the premises in February, 2015. They opened the rug gallery for business on March 1, 2015. Also in March, the defendants began making monthly use and occupancy payments to the plaintiffs in the amount of $16,338 per month. They obtained a certificate of occupancy for the Subway portion of the premises on June 5, 2015.

The plaintiffs initiated this summary process action after the defendants did not vacate the premises by the date specified in the notice to quit. The defendants raised six special defenses in response to the plaintiffs' complaint, including the special defense of equitable nonforfeiture. The parties filed a joint stipulation of facts on May 19, 2015, and a trial occurred over three

days. At trial, Nader and Sassoon testified that they decided to stop paying rent for a number of reasons, including that "this was the only way [they] could stay in business," that they "were trying to draw [the plaintiffs'] attention to what [they were] facing," and that they "were fearful [that], if [their franchisor] Subway for any reason [got] involved with this contamination and violations, where would [they] stand?"

The trial court rendered judgement of possession for the plaintiffs. The trial court's written order explained: "The court finds [that] the defendant[s] [have] breached the lease for nonpayment of rent. . . . The elements necessary to sustain the defense of equitable nonforfeiture do not exist in this case because the defendant[s] caused the breach intentionally. That finding alone negates any finding of equitable nonforfeiture." The defendants appealed to the Appellate Court. The defendants filed a motion for articulation, seeking, among other things, clarification of the factual basis for the trial court's determination that they had failed to meet their burden of proof on their special defense of equitable nonforfeiture. The motion for articulation included a request that the trial court articulate whether the court considered evidence that the defendants' failure to pay rent was accompanied by a good faith intent to comply with the terms of the lease or a good faith dispute over the meaning of the lease. The trial court denied the motion for articulation without comment.

The defendants filed a motion for review of the trial court's denial of their motion for articulation with the Appellate Court. The Appellate Court granted the motion for review in part, ordering the trial court to, inter alia, "articulate . . . whether it considered the defendants' good faith intent to comply with the lease and their good faith dispute over the meaning of the lease in reaching its decision on the special defense of equitable nonforfeiture and, if so, how its consideration of these matters impacted its decision on the defendants' special defense of equitable nonforfeiture . . . ." The trial court issued an articulation in which it articulated a number of factual findings and explained: "The trial court considered and rejected [the] defendants' claimed good faith intent to comply with the lease and also rejected the defendants' alleged good faith dispute over the meanings of the lease. The defendants were well-advised of the property and were ill-advised by their counsel to withhold rent and breach their obligation to pay rent to the plaintiff[s]."

Unsatisfied, the defendants filed a second motion for review of the trial court's articulation. The Appellate Court thereafter issued a second order for articulation, in terms substantially similar to the first order. The trial court responded with a supplemental articulation. The supplemental articulation stated: "The defendants' alleged concerns about the contamination [were] pre-

textual, since neither the contamination nor the remediation had any effect on the critical path of the defendants' renovations to the property. The defendants' real issue centers on the delays in renovation and, therefore, in openings of business operations, beyond the rental grace period, thereby obligating them to pay rent under the lease and to their existing landlords. The plaintiffs were not responsible for the delays [under the terms of the lease].

\* \* \*

"The defendants failed to prove that they were justified in withholding the rent because of the contamination issues affecting the subject premises. . . . [T]he plaintiffs . . . did promptly take steps to address the environmental issues affecting the exterior of the property, as required by [the lease]. . . . The defendants suffered no detriment as a result of the contamination and remediation. They failed to offer any evidence that they ever even complained about the contamination and remediation until they filed their answer in this case on March 24, 2015." In support of its conclusion that the contamination and remediation did not cause any detriment to the defendants, the trial court explained that "[n]either the contamination itself nor the remediation thereof affected the renovation time line of the retail [rug gallery] space or the Subway space; nor did the contamination and remediation affect the operation of either business."

The Appellate Court affirmed the judgment of the trial court. See *Boccanfuso* v. *Daghoghi*, 193 Conn. App. 137, 140, 171, 219 A.3d 400 (2019). The defendants petitioned for certification to appeal to this court, and we granted certification, limited to the following issue: "Did the Appellate Court properly uphold the trial court's judgment in favor of the plaintiffs and the denial of the defendants' special defense of equitable nonforfeiture?" *Boccanfuso* v. *Daghoghi*, 333 Conn. 943, 219 A.3d 373 (2019).

II

On appeal, the defendants claim that the Appellate Court improperly affirmed the trial court's judgment rejecting their special defense of equitable nonforfeiture and granting possession of the premises to the plaintiffs. The defendants argue that their failure to pay rent was not properly considered "wilful," as that term is understood under the doctrine of equitable nonforfeiture. The plaintiffs contend in response that the Appellate Court properly affirmed the trial court's judgment because the defendants' failure to pay rent was wilful. We agree with the plaintiffs that the trial court did not abuse its discretion when it rejected the defendants' defense of equitable nonforfeiture on the facts of this case and, therefore, affirm the judgment of the Appellate Court.

Our standard of review is clear. "We employ the abuse of discretion standard when reviewing a trial court's decision to exercise its equitable powers. . . . Although we ordinarily are reluctant to interfere with a trial court's equitable discretion . . . we will reverse where we find that a trial court acting as a court of equity could not reasonably have concluded as it did . . . or to prevent abuse or injustice. . . . In reviewing claims of error in the trial court's exercise of discretion in matters of equity, we give great weight to the trial court's decision. . . . [E]very reasonable presumption should be given in favor of its correctness." (Citations omitted; internal quotation marks omitted.) *Presidential Village, LLC* v. *Phillips*, 325 Conn. 394, 407, 158 A.3d 772 (2017). We remain mindful that "[o]ur practice in this [s]tate has been to give a liberal interpretation to equitable rules in working out, as far as possible, a just result . . . ." (Internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 630, 987 A.2d 1009 (2010).

"The doctrine of equitable nonforfeiture is a defense implicating the right of possession that may be raised in a summary process proceeding, and is based on the principle that [e]quity abhors . . . a forfeiture." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 106 n.15, 900 A.2d 1242 (2006). "Equitable principles barring forfeitures may apply to summary process actions for nonpayment of rent if: (1) the tenant's breach was not [wilful] or grossly negligent; (2) upon eviction the tenant will suffer a loss wholly disproportionate to the injury to the landlord; and (3) the landlord's injury is reparable." *Cumberland Farms, Inc.* v. *Dairy Mart, Inc.*, 225 Conn. 771, 778, 627 A.2d 386 (1993). Regarding the first requirement, we have explained that "[wilful] or gross negligence in failing to fulfill a condition precedent of a lease bars the application of the doctrine of equitable nonforfeiture. . . . In circumstances involving the nonpayment of rent, we have construed strictly this threshold requirement in deciding whether to grant equitable relief." (Citations omitted.) Id.

The leading modern case on equitable nonforfeiture in summary process actions is *Fellows* v. *Martin*, 217 Conn. 57, 584 A.2d 458 (1991). In *Fellows*, we addressed whether a residential tenant who deliberately withheld $25.01 from her monthly rent of $500.01 because of a dispute with her landlord over parking accommodations should be granted equitable relief from forfeiture. Id., 58–60, 67. We began by noting the large disparity between the landlord's loss of $25.01 and the plaintiff's potential loss of a ninety-nine year lease and an advance payment of $9900. Id., 67. Applying the maxim "de minimis non curat lex,"[7] we concluded that, under the facts presented in *Fellows*, "the underpayment of $25.01 is

insufficient, as a matter of law, to justify such a forfeiture." (Internal quotation marks omitted.) Id., 68. We explained that the de minimis nature of the tenant's breach meant that "eviction of the tenant would work a forfeiture wholly disproportionate to the injury suffered." (Internal quotation marks omitted.) Id., 67. Moreover, we noted that the record suggested that, after service of a notice to quit, the tenant had resumed monthly payments of her regular rental amount, plus the $25.01 she had previously withheld. Id., 69.

We also addressed the issue of wilfulness. We noted the general principle that "[a] court of equity will apply the doctrine of clean hands to a tenant seeking . . . equitable relief; thus, a tenant whose breach was [wilful] or grossly negligent will not be entitled to relief." (Internal quotation marks omitted.) Id., 67. The tenant's withholding of $25.01 from her rent in *Fellows* was indisputably intentional. We determined, however, that "[w]e need not decide whether a tenant who deliberately refuses to pay rent may yet claim relief under the equitable doctrine against forfeitures [when] the forfeiture is as grossly disproportionate as it is in this case." Id., 68. It was unnecessary to decide that issue because the trial court had determined that the tenant's nonpayment was prompted by a good faith dispute over the meaning of a lease term, which we said is a ground that may excuse deliberate nonpayment if the trial court determines that the equities so require. See id., 69 ("[t]he doctrine against forfeitures applies to a failure to pay rent in full when that failure is accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of a lease"). We explained that "the trial court found that the tenant withheld the rent in a dispute over her parking accommodations. She apparently believed that she had the right to withhold rent if her landlord breached the lease. While her belief was erroneous . . . her misconception amounts to a mistake of law, rather than the type of wilfulness disapproved by [our case law] and other authorities." (Citation omitted; internal quotation marks omitted.) Id., 68. Chief Justice Peters made this same point in a concurring opinion, in which she concluded that, "[because] the tenant's breach was not [wilful], *but was premised on a good faith dispute*, forfeiture of her interest would be wholly disproportionate to the gravity of her default." (Emphasis added.) Id., 72 (*Peters, C. J.*, concurring). To summarize, *Fellows* demonstrates that a tenant's intentional nonpayment of rent does not require a finding that the nonpayment is wilful under the equitable nonforfeiture doctrine if nonpayment "is accompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of a lease." Id., 69.

In the present case, the trial court found that the defendants' intentional nonpayment of rent was not accompanied by a good faith intent to comply with the

lease or a good faith dispute over the meaning of the lease. In its first articulation, the trial court explained that it "considered and rejected [the] defendants' claimed good faith intent to comply with the lease and also rejected the defendants' alleged good faith dispute over the meanings of the lease." The trial court elaborated in its supplemental articulation, explaining: "The defendants' alleged concerns about the contamination [were] pretextual, since neither the contamination nor the remediation had any effect on the critical path of the defendants' renovations to the property. . . .

\* \* \*

"The defendants failed to prove that they were justified in withholding the rent because of the contamination issues affecting the subject premises. . . . [T]he plaintiffs . . . did promptly take steps to address the environmental issues affecting the exterior of the property, as required by [the lease]. . . . The defendants suffered no detriment as a result of the contamination and remediation. They failed to offer any evidence that they ever even complained about the contamination and remediation until they filed their answer in this case on March 24, 2015." Instead, the court explained: "The defendants' real issue centers on the delays in renovation and, therefore, in openings of business operations, beyond the rental grace period, thereby obligating them to pay rent under the lease and to their existing landlords. The plaintiffs were not responsible for the delays [under the terms of the lease]." In so finding, the court referenced paragraph 31 of the lease, which provides that the "[l]essee, at his expense shall make all necessary repairs and replacements to the [l]leased [p]remises," and paragraph 32, which provides that "[a]ll alterations and improvements to the [p]remises are the [l]essee's sole responsibility. All expenses and costs associated with the required zoning change of use are the [l]essee's sole responsibility."

The trial court found, in other words, that the defendants' decision not to pay rent was motivated by the difficulties arising from the delay in the renovation and occupancy of the premises, and, in fact, had nothing to do with a dispute over the terms of the lease, which explicitly placed the responsibility for renovations and alterations on the defendants. If the delay implicated any good faith dispute over contractual terms, that dispute involved the contract between the defendants and Girouard for "consulting" and "design services" regarding the renovations. The trial court found, however, that the agreement between the defendants and Girouard "was entered into separate from and independent of the agreement between the plaintiffs . . . and the defendants . . . ."

Our review of the record leads us to conclude that the trial court did not abuse its discretion in determining that the defendants' withholding of rent was unaccom-

panied by a good faith intent to comply with the lease or a good faith dispute over the meaning of the lease. We find Sassoon's testimony at trial particularly illuminating on this point. When asked why the defendants stopped paying rent, Sassoon explained: "[I]t was [an] act of desperation. Because we were trying to draw [the plaintiffs'] attention to what we [were] facing, [how] we [were] hurting. Because [Girouard] was not taking our orders. He was not returning our phone calls. He was not taking our orders. So this was [the] only way we could stay in business and pay for our rent.[8] Because we were deep into the project, without being into the building. And we just wanted the project to finish so we could get into the building." (Footnote added.) Withholding rent in order to "stay in business" and to "draw [the plaintiffs'] attention" to the defendants' difficult financial situation demonstrates neither a good faith intent to comply with the lease nor a good faith dispute over the meaning of the lease.[9]

Our analysis does not end there, however, because this case requires us to address the issue left open in *Fellows*, that is, whether a defendant's intentional nonpayment of rent must *necessarily* be deemed wilful, for purposes of the equitable nonforfeiture doctrine, if the tenant cannot show that the withholding was the result of a good faith intent to comply with the lease or a good faith dispute over the meaning of the lease. See *Fellows* v. *Martin*, supra, 217 Conn. 68 ("[w]e need not decide whether a tenant who deliberately refuses to pay rent may yet claim relief under the equitable doctrine against forfeitures [when] the forfeiture is as grossly disproportionate as it is in this case"). Without foreclosing the likelihood that this question may not be susceptible to a categorical answer applicable to all cases and all circumstances, we have no difficulty answering it in the affirmative in the present case, on this record, given the trial court's finding that the defendants' purported reason for withholding rent—their concerns about environmental contamination—was "pretextual." "A court of equity will apply the doctrine of clean hands to a tenant seeking . . . equitable relief; thus, a tenant whose breach was [wilful] or grossly negligent will not be entitled to relief." (Internal quotation marks omitted.) Id., 67; see also *Fairchild Heights, Inc.* v. *Dickal*, 118 Conn. App. 163, 178–79, 983 A.2d 35 (2009) (denying tenants equitable relief from forfeiture because of unclean hands), aff'd, 305 Conn. 488, 45 A.3d 627 (2012). It is axiomatic that, "[when] a [party] seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001). Withholding rent on pretextual grounds is outside the bounds of the "fair, equitable and honest" conduct expected of a party seeking equitable relief. (Internal quotation marks omitted.) Id. Because the defendants

intentionally withheld rent on pretextual grounds in the absence of any good faith dispute over the terms of the lease, it was within the trial court's equitable discretion to determine that the defendants acted wilfully and were ineligible for equitable relief from forfeiture. See 2 S. Symons, Pomeroy's Equity Jurisprudence (5th Ed. 1941) § 452, pp. 287–88 ("While a defaulting party may thus acquire a right to the equitable relief from the conduct of the other party, he may also lose the right, which otherwise would have existed, as a consequence of his own conduct. . . . He who asks help from a court of equity must himself be free from inequitable conduct with respect to the same [subject matter].").

We are not persuaded by the defendants' argument that conduct is wilful within the meaning of the doctrine of equitable nonforfeiture only if it is "intentional conduct designed to injure . . . ." (Internal quotation marks omitted.) In support of this argument, the defendants cite a footnote in *19 Perry Street, LLC* v. *Unionville Water Co.*, supra 294 Conn. 611, in which we stated that "[w]ilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. . . . Not only the action producing the injury but the resulting injury also must be intentional. . . . [T]he term wilful has [also] been used to describe conduct deemed highly unreasonable or indicative of bad faith." (Citation omitted; internal quotation marks omitted.) Id., 630–31 n.10. Although *19 Perry Street, LLC*, concerned the doctrine of equitable nonforfeiture, we did not confront the question of when a tenant's nonpayment of rent is wilful in the absence of a good faith intent to comply with the lease or a good faith dispute over the meaning of the lease. Instead, we determined that the tenant's nonpayment had not been wilful because it had been accompanied by a good faith intent to comply with the lease. See id., 634. We reject the suggestion that the generic definition of wilful contained in *19 Perry Street, LLC*, which we borrowed, perhaps without adequate consideration, from the tort and employment law contexts,[10] was intended to serve as a definitive statement of the meaning of "wilful" for the doctrine of equitable nonforfeiture. Indeed, we have previously noted that "wilful is a word of many meanings, and its construction [is] often . . . influenced by its context"; (internal quotation marks omitted) *State* v. *Newton*, 330 Conn. 344, 362, 194 A.3d 272 (2018); and that observation is fitting here. Upon reflection, it is clear to us that the definition of wilfulness connoting an injurious intent, although apt in other contexts, serves no productive role in the equitable nonforfeiture analysis. A tenant's nonpayment can be wilful within the meaning of the equitable nonforfeiture doctrine in the absence of any "design" on the tenant's part to cause

harm to the landlord; indeed, most summary process actions based on nonpayment involve tenants who intend no harm but simply find themselves without the financial means to meet their obligations. We therefore disavow the definition of wilfulness contained in the footnote in *19 Perry Street, LLC*, to the extent that it would require a finding of injurious intent to trigger a finding of wilfulness under the equitable nonforfeiture doctrine.

The defendants intentionally withheld rent payments unaccompanied by a good faith intent to comply with the lease or a good faith dispute over the meaning of the lease. As previously discussed, the trial court found that the defendants' purported environmental concerns were "pretextual" and that their actual reasons for withholding rent were their dissatisfaction with the delays in their renovations to the premises—delays not attributable to the plaintiffs' conduct—and the difficulty in paying rent to both their previous landlords and the plaintiffs. Under these facts, it is clear that the trial court did not abuse its discretion in refusing to grant the defendants equitable relief from forfeiture.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** September 30, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The facts as recited are those stipulated to by the parties, those found by the court in its original decision or subsequent articulations, or those the court reasonably could have found.

[2] At that time, the department was named the Department of Environmental Protection. Effective July 1, 2011, the legislature established DEEP as the successor agency to the Department of Environmental Protection. See Public Acts 2011, No. 11-80, § 1. For ease of reference, we refer to the department as DEEP.

[3] Despite these letters and the earlier DEEP inspections of the tank, Dominick testified that he was not aware of any environmental contamination on the premises at the time the parties signed the lease in November, 2013. Dominick explained that, after he received the test results from Absolute Tank, he spoke to an official at DEEP who informed him that the results were not significant and "[didn't] mean a thing in contamination." Dominick testified that he became aware of the contamination only after DEEP issued an order to the plaintiffs in July, 2014, to remediate the contamination. The trial court found that neither the plaintiffs nor the defendants were aware that the premises contained contaminants "above action levels" prior to a subsequent order issued by DEEP in July, 2014.

[4] Dominick's response to Nader's inquiry was in dispute at trial. Nader testified that Dominick told him that "[t]here was no contamination, there was no trace of any violations whatsoever. . . . There [were] never any violations." Dominick testified that he told Nader, "if this property is contaminated, [the defendants will] take care of all the contamination . . . ."

[5] Girouard printed this letter on stationery with the letterhead "Klein New England." From the testimony adduced at trial, it appears that Klein New England is a sole proprietorship owned by Girouard.

[6] Girouard testified that the term "owners" referred to the defendants. Sassoon testified that he understood the term to refer to the plaintiffs.

[7] De minimis non curat lex means "[t]he law does not concern itself with trifles." Black's Law Dictionary (11th Ed. 2019) p. 544.

[8] The defendants were obligated to pay rent on a lease for another property, where their businesses previously had been located and remained located while renovations progressed.

[9] The defendants point out that they deposited the withheld rent in an

escrow account and argue that this demonstrates their good faith intent to comply with their obligation to pay monthly rent. The defendants cite our decision in *19 Perry Street, LLC* v. *Unionville Water Co.*, supra, 294 Conn. 611, in support of their argument. Although the payment of the withheld rent into escrow may be a fact warranting consideration by the trial court, it does not alone compel a finding of good faith. In *19 Perry Street, LLC*, the defendant water company learned that its landlord had sold the leased premises but did not know to whom. Id., 618–19. The defendant undertook efforts to determine the identity of the new owner and began stockpiling funds for purposes of paying rent once the owner was identified. Id. The defendant learned the identity of the new owner only when that owner served a notice to quit on the defendant. Id., 619. At that point, the defendant offered to pay all past due rent using its stockpiled funds. Id. We determined that the defendant's stockpiling of rent while it sought to determine the identity of its new landlord demonstrated a good faith intent to comply with the lease, explaining that "[s]etting aside . . . or stockpiling funds *in the event they became due* contraindicates any intentional or purposeful failure to pay rent . . . ." (Emphasis added.) Id., 634. This holding has little relevance in the present case, in which the defendants plainly knew the identity of their landlord but nonetheless decided to stockpile funds *in lieu of* paying rent that had already become due under the undisputed terms of the lease.

[10] The footnote in *19 Perry Street, LLC*, cited the definitions of wilfulness provided in *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988), a tort action, and *Saunders* v. *Firtel*, 293 Conn. 515, 531, 978 A.2d 487 (2009), an appeal construing a number of employment statutes and statutes governing limited liability companies. See *19 Perry Street, LLC* v. *Unionville Water Co.*, supra, 294 Conn. 631 n.10.